**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Jack LANG, Walter Soots, Ralph Smith and Rick Corder, Defendants-Appellants.**

Nos. 78–1557, 78–1583, 78–1585, and 78–1589.

United States Court of Appeals, Seventh Circuit.

Argued June 4, 1980.

Decided April 2, 1981.

As Amended April 6, 1981.

Rehearing and Rehearing En Banc Denied May 20, 1981.

---

Robert S. Bailey, Paul T. Wangerin, Chicago, Ill., for defendants-appellants.

Robert T. McAllister, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

* Senior District Judge Robert A. Grant, United States District Court for the Northern District of Indiana, is sitting by designation.

Before FAIRCHILD and CUMMINGS, Circuit Judges, and GRANT, Senior District Judge.*

GRANT, Senior District Judge.

This appeal presents several issues arising from the defendants' conviction for mail and wire fraud.[1] The defendants' first contention is that the indicting grand jury was incorrectly constituted with respect to both due process guarantees and Fed.R.Crim.P. 6(f), due to the fact that substitutions were made for a number of grand jurors during the course of the lengthy investigation in this case. Second, the defendants contend that the petit jury was incorrectly instructed when the trial court rejected the defendants' supplemental instructions and chose to fully reinstruct the jury with the original charge in response to juror inquiries. Finally, defendant Corder seeks a stay of his conviction and special relief based upon allegations that he was denied the effective assistance of his counsel at trial.

## I. Factual Background

The defendants were charged in a 75-count indictment for mail and wire fraud violations, and convicted by jury after a two month trial. The defendants were convicted of selling fraudulent distributorships which would have enabled the defrauded distributors to market consumer goods to retailers. Defendant Lang was the moving force in this operation, while Soots, Smith and Corder were salesmen.

Lang incorporated the National Products Research and Development Corporation (NPRD) to sell a new brand of aerosol products which he intended to have made for his operation. The "Mini Mist" aerosols were to include deodorants and hair and breath sprays. Lang trained his salesmen to use a "negative sell" approach, whereby the potential victim was enticed to convince the salesman that he would be a successful distributor. The salesmen were also taught

1. 18 U.S.C. §§ 1341 and 1343 respectively.

to masquerade as psychiatrists, and to lull their victims by proffering photographs of a modern company headquarters and manufacturing facility, which, alas, did not exist. By paying $3,500 to $5,500, the new distributor then had the exclusive right to market NPRD wares in a fixed geographical area, supposedly serving the retail outlets that NPRD would establish.

It took Lang six months from the date of solicitation of the first distributorship to contract with a pharmaceutical company to create "Mini Mist" products. Delivery of these aerosols was further delayed by production problems. When the products were finally marketed, it became apparent they had no satisfactory commercial shelf life. NPRD quietly, but quickly, closed its doors, without leaving a forwarding address for those who had invested in distributorships.

By the time NPRD had gone out of existence, Lang had already established a second corporation, Market Research International Corporation (MRIC), which was organized to sell a bona fide product, Watchguard Burglar Alarms, and later added Flower Power flower pots. The method of seeking distributorships remained the same, but the privilege of owning an MRIC alarm distributorship was $12,500.

When the FBI and FTC investigators widened their inquiry from the already defunct NPRD to MRIC, the latter corporation collapsed, unable to obtain credit from legitimate banking sources. Every distributor lost his investment in both NPRD and MRIC, many without seeing the product in which they had invested.

## II. *The Indicting Grand Jury*

The Special November 1975 Grand Jury which returned the indictments in this case began its investigation in November, 1975. Although an ordinary grand jury's term of service is generally 18 months, the Organized Crime Control Act of 1970, 18 U.S.C. § 3331, *et seq.*,[2] extended this time to 36 months for special grand juries in an effort to combat organized crime and to investigate complex criminal schemes. Such special grand juries are otherwise regulated by the same rules and case law as regular grand juries. 18 U.S.C. § 3334.

Fed.R. of Crim.P. 6(g) provides for the discharge and excuse of grand jurors:

> Discharge and Excuse. A grand jury shall serve until discharged by the court but no grand jury may serve more than 18 months. The tenure and powers of a grand jury are not affected by the beginning or expiration of a term of court. *At any time for cause shown the court may excuse a juror either temporarily or permanently, and in the latter event the court may impanel another person in place of the juror excused.*

(emphasis added).

Of the original 23 members impaneled on this special grand jury, fifteen members had, from time to time, been lawfully excused and replaced by newly sworn grand jurors by June 17, 1977, the date that indictments were returned against the appellants. Although appellants contend that only 8 of the original 23 grand jurors remained on the panel, the appellants' consolidated abstract and statement of the facts indicates that at least 11 grand jurors heard the entire investigation. On December 1, 1975, three grand jurors had been lawfully replaced, while Lang's case was not first presented to the Special Grand Jury until December, 1975. These first three "replacements" heard the entire investigation and, therefore, appellants cannot claim any prejudice from their participation on this grand jury.

The defendants became aware of these replacements when their motion for discovery of the grand jury proceedings was granted, and based upon this information, they filed a motion to dismiss the indictments, arguing that the grand jury was improperly constituted. The district court refused to dismiss the indictments, and the defendants renew their contentions in this appeal. They contend that only the eight original grand jurors who remained part of

---

2. Pub.L.No.91–452, § 101, 84 Stat. 923 (1970). Legislative history, H.R.Rep.No.91–1549, 91st Cong., 2nd Sess. 2, *reprinted in* [1970] U.S. Code Cong. & Ad.News 4007, 4014–17.

the panel from its inception were sufficiently well versed in this particular investigation to vote a "true bill". The defendants' theory is that at some point replacements cannot be allowed. Specifically, they suggest two such points. First, that the grand jury was no longer properly constituted when its original membership fell below 16. Fed.R.Crim.P. 6(a). In the alternative, the defendants contend that the grand jury cannot be properly constituted when less than 12 of the original members remain on the panel. Fed.R.Crim.P. 6(f).

Overall the defendants argue that replacement of grand jurors for good cause on the scale practiced here is unfair and unsatisfactory with respect to Rule 6; and, although their particular theory is not specifically explained, they argue the procedure violated their Fifth Amendment due process rights.

We begin our analysis by noting that the grand jury remains a creature of statute, at least in the provisions for its governance. *In re Mills*, 135 U.S. 263, 267, 10 S.Ct. 762, 763, 34 L.Ed.2d 107 (1890). In the present case, Rule 6 provides the applicable statutory standard. A literal reading of Rule 6 does not lend credence to any limitation upon the number of grand jurors who can be replaced for good cause. The only numerical limitations in the Rule appear in 6(a), (f) and (g). Rule 6(a) states in part: "The grand jury shall consist of not less than 16 nor more than 23 members." Rule 6(f) states: "An indictment may be found only upon the concurrence of 12 or more jurors." Rule 6(g), *supra*, provides the process for replacing grand jurors, but places no limitation upon the number of grand jurors who can be replaced. It seems axiomatic that had Congress intended to create limits on the numbers that could be replaced, Rule 6(g) is the logical place to have included such a limitation. For this reason, we hold that Rule 6 is not breached by the grand jury replacements in this case.

At least one other circuit court has reached the same conclusion. The dictates of Rule 6 were recently considered in a case which focused upon the attendance required of grand jurors. This case is typical of recurring attempts to have indictments invalidated when the individual grand jurors do not attend every session of the grand jury, although a quorum is present at each meeting. In *United States v. Leverage Funding Systems, Inc.*, 478 F.Supp. 799 (C.D.Cal.1979), the district court invalidated indictments when it was shown that only 9 grand jurors had attended all the sessions, and heard all the evidence pertaining to the proposed indictments. By a 2–1 vote the Ninth Circuit Court of Appeals reversed, stating:

> This court must give effect to the express terms of Rules 6(a) and (f) unless such an interpretation would frustrate the purpose of the rules (i. e., implementation of the grand jury provision of the Fifth Amendment.) See *e. g., Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 643 [98 S.Ct. 2053, 2061, 56 L.Ed.2d 591] (1978); *Commissioner v. Brown*, 380 U.S. 563, 571 [85 S.Ct. 1162, 1166, 14 L.Ed.2d 75] (1965).

*United States v. Leverage Funding System, Inc.*, 637 F.2d 645 (9th Cir. 1980).

It is clear that the provision of a quorum mechanism in Rule 6 belies any intention to impose the type of perfect attendance rule suggested by the district court in *Leverage Funding*, or by implication in this case before us. Instead, the integrity of the grand jury's membership is protected by the time limitations on the grand jury's length of service. This term of service, whether it be 18 or 36 months, must be scrupulously adhered to. *United States v. Macklin*, 523 F.2d 193 (2d Cir. 1975).

Since their contentions regarding Rule 6 are without merit, the defendants can succeed in having this indictment dismissed only if the replacement procedure, as utilized here, frustrates the historic purposes of the grand jury, and hence the Fifth Amendment, or impinges on the defendants' Fifth Amendment due process rights. The Fifth Amendment to the Constitution provides in pertinent part: "No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury . . . ." Rule 6 is

merely the congressional implementation of this constitutional requirement. Generally, the Fifth Amendment requirements are satisfied when an independent and informed grand jury votes an indictment. *Wood v. Georgia,* 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962). The question presented is whether this grand jury was sufficiently informed.

The extent of procedural protections generally required in the grand jury proceedings [3] was addressed by the Supreme Court in *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), which summarized the role of the grand jury in the criminal law system:

> Because the grand jury does not finally adjudicate guilt or innocence, it has traditionally been allowed to pursue its investigative and accusatorial functions unimpeded by the evidentiary and procedural restrictions applicable to a criminal trial.

*Id.* at 349, 94 S.Ct. at 620.

*Calandra* held that the exclusionary rule does not apply to grand jury proceedings. The test to decide whether a procedural protection was warranted was also stated:

> ... we must weigh the potential injury to the historic role and functions of the grand jury against the potential benefits of the rule [exclusionary rule] as applied in this context.

*Calandra, supra,* 414 U.S. at 349, 94 S.Ct. at 620.

Our case impacts upon the investigatory function of the grand jury, the importance and scope of which has been discussed at length by the Supreme Court in *Calandra,* 414 U.S. at 344, 94 S.Ct. at 618:

> The grand jury's investigative power must be broad if its public responsibility is adequately to be discharged. *Branz-*
> *burg v. Hayes, supra,* [408 U.S.] at 700 [92 S.Ct. at 2666]: *Costello v. United States, supra,* [350 U.S.] at 364 [76 S.Ct. at 409].

In *Branzburg,* the Court had occasion to reaffirm the importance of the grand jury's role:

> "[T]he investigation of crime by the grand jury implements a fundamental governmental role of securing the safety of the person and property of the citizen...." 408 U.S., at 700 [92 S.Ct., at 2666].
> "The role of the grand jury as an important instrument of effective law enforcement necessarily includes an investigatory function with respect to determining whether a crime has been committed and who committed it.... 'When the grand jury is performing its investigatory function into a general problem area ... society's interest is best served by a thorough and extensive investigation.' *Wood v. Georgia,* 370 U.S. 375, 392 [82 S.Ct. 1364, 1374, 8 L.Ed.2d 569] (1962). A grand jury investigation 'is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed.' *United States v. Stone,* 429 F.2d 138, 140 (CA2 1970) ... It is only after the grand jury has examined the evidence that a determination of whether the proceeding will result in an indictment can be made...." *Id.,* at 701–702 [92 S.Ct., at 2666–2668.]

*Id.,* 414 U.S. at 344, 94 S.Ct. at 618.

Balanced against this historic purpose, the defendants contend that a rule limiting replacements will insure that each grand juror hears, or has access to, the evidence that is presented. Their theory is that this

---

**3.** In *Rose v. Mitchell,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), the Court debated whether a criminal defendant is prejudiced when the indictment is returned by an invalid grand jury, but a constitutionally valid petit jury finds him guilty beyond a reasonable doubt. The Court concluded that racial discrimination in the grand jury makeup was a sufficient basis for federal habeas corpus relief. Justices Stewart and Rehnquist concurred in the judgment but refused to accept the Court's resolution of this particular issue. They felt that any possible prejudice to the defendant in the grand jury proceedings disappears as a valid basis for relief when a valid trial jury finds a defendant guilty. *Id.* at 575, 99 S.Ct. at 3010. *See Cassell v. Texas,* 339 U.S. 282, 298, 70 S.Ct. 629, 637, 94 L.Ed. 839 (1950) (Jackson, J., dissenting).

will insure that the grand jurors find probable cause to indict based on all the testimony presented.[4]

The leading case to weigh the potential benefit and burden of such a rule as the defendants have proposed is Judge Learned Hand's opinion in *United States ex rel. McCann v. Thompson,* 144 F.2d 604 (2d Cir.), *cert. denied,* 323 U.S. 790, 65 S.Ct. 313, 89 L.Ed. 630 (1944). This case is expressly followed by *United States v. Leverage Funding Systems, Inc., supra,* (9th Cir.); *United States v. Colasurdo,* 453 F.2d 585, 596 (2d Cir. 1971), *cert. denied,* 406 U.S. 917, 88 S.Ct. 1834, 20 L.Ed.2d 875 (1972); *Lustiger v. United States,* 386 F.2d 132, 139 (9th Cir. 1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1042, 19 L.Ed.2d 1142 (1968); *United States v. Pastor,* 419 F.Supp. 1318 (S.D.N.Y. 1975). In *McCann,* the attendance of grand jurors was being challenged. Although at least 12 unchallenged and otherwise qualified grand jurors heard the evidence as it was presented at every session of the grand jury, their attendance had fluctuated, so that the same 12 members were not present at each session. The *McCann* court rejected the defendant's claim that less than perfect

attendance by twelve grand jurors invalidated the indictments. Judge Hand's reasoning is equally applicable to a replacement situation such as this. *McCann* states 144 F.2d at 607:

On principle the objection seems to us not well taken. Since all the evidence adduced before a grand jury—certainly when the accused does not appear—is aimed at proving guilt, the absence of some jurors during some part of the hearings will ordinarily merely weaken the prosecution's case. *If what the absentees actually hear is enough to satisfy them, there would seem to be no reason why they should not vote.* Against this we can think of nothing except the possibility that some of the evidence adduced by the prosecution might conceivably turn out to be favorable to the accused; and that, if the absentees had heard it, they might have refused to vote a true bill. No one can be entirely sure that this can never occur; but it appears to us so remote a chance that it should be left to those instances in which it can be made to appear that the evidence not heard was of that character, in spite of the extreme

**4.** The appellants' position receives some support from *United States v. Roberts,* 481 F.Supp. 1385 (C.D.Cal.1980), where a set of grand jury indictments were dismissed in another "perfect attendance" case. In *Roberts* eight grand jurors maintained perfect attendance, while three others missed some sessions, but read transcripts of the testimony presented in their absence. Following the lead of the district court's decision in *United States v. Leverage Funding Systems, Inc., supra,* (before that decision was reversed by the Ninth Circuit Court of Appeals), the district court dismissed the indictments to "protect due process and to preserve established Constitutional principles requiring the maintenance of the grand jury's independence and integrity." (citation and footnote omitted). *Roberts,* 481 F.Supp. at 1388. *Roberts* was marked by abusive prosecutorial practices affecting the conduct of the grand jury investigation, including the prosecutor's failure to abide by an agreement with the district court. The *Roberts* holding is now open to question due to the subsequent ruling of the Ninth Circuit Court of Appeals reversing *Leverage Funding, supra.*

Appellants' position did not succeed in a similar case in the same district. *United States v.*

*Godoy,* No. CR 79–660(A) (C.D.Cal. Nov. 6, 1979). From the number of cases simultaneously raising this issue of grand juror attendance and replacement, the incidence of problems has increased contemporaneously with the extended term of service allowed for grand juries. In addition, two state Supreme Courts have ruled that replacement of state grand jurors is unacceptable under state law. In *Commonwealth v. Levinson,* 480 Pa. 273, 389 A.2d 1062 (Pa.1978), the Pennsylvania Supreme Court ruled that replacement of six grand jurors from the 23 person panel after the grand jury had begun its investigation was unacceptable. Pennsylvania has no provision akin to Fed.R.Crim.P. 6(f) and (g) to allow for replacement of grand jurors. In California, the function of the grand jury is to weigh all the evidence presented, and the prosecutor must present any exculpatory evidence that exists. In light of this, the California Supreme Court has held that all 12 jurors voting to indict must hear all the evidence presented. *California v. Fujita,* 43 Cal.App.3d 454, 476–77, 117 Cal.Rptr. 757, 771 (1974), *cert. denied,* 421 U.S. 964, 95 S.Ct. 1952, 44 L.Ed.2d 451 (1975).

difficulty of ever proving what was the evidence before a grand jury.

(emphasis added).

In *United States v. Pastor, supra,* 419 F.Supp. at 1329, the same *McCann* language on grand juror responsibilities was cited, along with this commentary:

> The argument of *McCann* is, thus, a practical one. It does not assume that the grand jury is merely to be a mechanism of the prosecutor. *To the contrary, it merely presumes that the individual grand jurors are honest and conscientious in their voting, fully cognizant of their oath, but nevertheless sometimes able to find a prima facie case on less than all the evidence presented.*

(emphasis added). Indeed, the raison d'etre of a grand jury is the belief that an independent review by a body of citizens is the best protection from ill-advised and malicious prosecutions. *Wood v. Georgia, supra,* 370 U.S. at 390, 82 S.Ct. at 1373; *Branzburg v. Hayes,* 408 U.S. 665, 686–88, 92 S.Ct. 2646, 2659–60, 33 L.Ed.2d 626 (1972). The required deference to the grand jury was restated in *Leverage Funding Systems, Inc., supra,* by the Ninth Circuit:

> The Fifth Amendment bestows upon grand jurors a heavy responsibility, but lacking evidence to the contrary, courts must presume that grand jurors have properly performed their duties. *See Ostrer v. Aronwald,* 567 F.2d 551, 553–54 (2d Cir. 1977). Courts must also presume that a grand juror who votes to indict an individual on a particular count has heard sufficient evidence to believe that a trial on that count is warranted. *Id.* Leverage Funding has cited no authority, and we have found none, which even suggests that the Fifth Amendment requires the abandonment of this presumption unless a grand juror has heard *all* the evidence presented by the prosecution.

In addition, this is the typical grand jury case Judge Hand discussed in *McCann.* The appellants never appeared before the grand jury, raising a logical inference that none of the testimony presented was exculpatory in nature. Rather, if the grand jurors missed some of the testimony in this case that fact can be presumed to have been inculpatory in nature. The fact that some replacement grand jurors missed some of the testimony in this case would inure to the benefit, not the detriment of the appellants.

To the importance of the grand jury's investigative functions, and Judge Hand's reasoning in *McCann,* we can add other reasons why the balance in this case does not mandate a judicially created prophylactic rule limiting grand juror replacements. Such a judicially created limit could frustrate the explicit congressional intent of extending the length of grand jury service. This extension was found necessary to respond to the increasingly complex crimes federal prosecutors must police. Such a limit could mandate the discharge of an investigative grand jury at the very point they are ready to vote indictments. The first effect of such a discharge would be an inefficient use of prosecutorial resources. The prosecutor would be left with the business of recreating the investigation for a new body of citizens. The possible fallout of such a delay would be a resulting reduction in witness memory and reliability, a condition as harmful to defendants as it is to society as a whole.

Furthermore, there is no constitutional requirement that primary evidence be presented to the grand jury. *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). In this case, the jurors heard a summary witness, the government agent who conducted the investigation, before they voted to indict. This in itself could have provided sufficient evidence to allow the indictment to be voted. For this reason, the prejudice to appellants, if any, was further minimized.

Nor do we seek to encourage a routine inquiry into grand jury attendance and voting records. Disclosure of grand jury testimony and voting records is required when defendants show a "particularized need" for the information before the grand jury secrecy privileges in Rule 6(c) are to be violated. *Pittsburgh Plate Glass Co. v. United States,* 360 U.S. 395, 400, 79 S.Ct. 1237,

1241, 3 L.Ed.2d 1323 (1959); *State of Wisconsin v. Schaffer*, 565 F.2d 961 (7th Cir. 1977). In an effort to avoid the creation of a routine disclosure requirement of voting and attendance records, other courts have refused to find the absence of grand jurors to be a problem. *United States v. Pastor, supra*, 419 F.Supp. at 1328–29. *United States v. Colasurdo, supra*, 453 F.2d at 596. Were we to grant appellants the rule they seek, inevitably the inquiry into grand jury attendance will grow into a routine inquiry as to how the individual grand jurors voted. For example, in *United States v. Colasurdo, supra*, the appellants contended that where 11 defendants were indicted on 45 counts, 12 or more grand jurors had to be present to hear the evidence that supports the "233 decisions" involved. While Judge Oakes called this suggestion ingenious, he based his refusal on the *McCann* holding. In any event, a rule such as the appellants envision would only result in a windfall unrelated to prejudice or the evidence presented.

No blanket rule regarding the extent of grand juror replacement can be made from this case. Prosecutors can insure that the perception of fairness, as well as its substance, are maintained by giving replacement and absent grand jurors the opportunity to review transcripts or summaries of missed sessions. That should go a long way to ameliorate the concerns raised here.

In conclusion, the speculative benefit of a broad judicial limit on the number of grand jury replacements may serve a minimal public interest in preserving the purity of the grand jury proceedings. However, it would disserve other public interests of a weightier nature. The replacement procedure does not violate either Rule 6 or the applicable constitutional guarantees.

In light of our resolution of this issue, the appellants' request to unseal the grand jury transcripts and records pertaining to this case is also denied.

### III. *Reinstructing the Petit Jury*

■ During the second day of jury deliberations, the court received a note from the jurors requesting assistance on the definition of defraud as it related to the defend- ants' intention to defraud in this case. Although supplemental instructions were proposed by defendants, the court answered this question by rereading the original jury charge. The propriety and correctness of the original instructions has not been raised as an issue on appeal. Reinstructing the jury by rereading the original instructions was a proper course of action, well within the discretion of the trial court. This issue was previously considered in *United States v. Braverman*, 522 F.2d 218, 224 (7th Cir.), *cert. denied*, 423 U.S. 985, 96 S.Ct. 392, 46 L.Ed.2d 302 (1975), where this court stated:

> The necessity, extent, and character of any supplemental instructions to the jury are matters within the discretion of the district court. (citation omitted).

This issue was also raised in *United States v. Papia*, 560 F.2d 827, 843 (7th Cir. 1977), where the court reiterated the correctness of rereading instructions that properly state the law applicable to this case. *Accord, United States v. McCall*, 592 F.2d 1066, 1068–69 (9th Cir.), *cert. denied*, 441 U.S. 936, 99 S.Ct. 2061, 60 L.Ed.2d 665 (1979). Where the defendants-appellants do not question the correctness of the original instructions, and the rereading was responsive to the jury inquiry, there is no error.

■ The defendants sought a supplementary instruction that, with regard to the specific intent to deceive element, "the good faith intent of any defendant to make a business enterprise succeed is a relevant factor to be considered by you with intent to defraud." The defendants' theory was that any misrepresentations which occurred in this case were innocent errors, and that the defendants made bona fide attempts to make the NPRD and MRIC corporations' operations successes. However, even the most praiseworthy attempt to make a business succeed does not excuse the use of deliberate misrepresentations made to deceive. *See Linn v. United States*, 234 F. 543, 552 (7th Cir. 1916). The jury's question appropriately related to the representations made by the defendants, and inquired as to the requirements of intent to defraud as they related to this.

The instructions given by the court properly stated the law on specific intent and good faith of individual defendants as it applied to mail and wire fraud. The court's instructions continually emphasized that the defendants had to knowingly and willfully participate in the scheme to defraud, through representations made "knowing they were false and [made] with the intent to defraud." The jurors were instructed that intent to defraud meant "... the acts were done *knowingly, with the specific purpose to deceive* in order to cause financial loss to another or financial gains to one's self." (emphasis added). The jurors were read the following instruction on good faith and specific intent:

> Good faith constitutes a complete defense to one charged with an offense of which fraudulent intention is the essential element. Anyone who acts with honest intentions is not chargeable with fraudulent intent. One who expresses an opinion honestly held by him, or a belief honestly maintained by him, is not chargeable with fraudulent intent, even though his opinion is in error or his belief is mistaken. Evidence which establishes only that a person made a mistake in judgment or an error in judgment or in management or was careless does not establish fraudulent intent.

The question of whether a jury has been properly instructed is to be determined not upon consideration of one single paragraph, sentence, phrase or word, but upon the charge as a whole. *United States v. Walsh*, 627 F.2d 88 (7th Cir. 1980). In this case, the court did not err in excluding defendants' supplemental instructions.

### IV. *Corder Claims Ineffective Assistance Of Counsel*

On appeal, defendant Corder raises an issue that was not considered by the court below. By his own affidavit and through the arguments of a newly appointed counsel, Corder makes serious allegations concerning the incompetency of his counsel at trial. These allegations range from insufficient preparation and failure to put on a defense of Corder independent of the other defendants, to personal problems that allegedly distracted Corder's attorney during the trial. As relief, Corder requests this Court to order a hearing on these matters in the trial court, staying his appeal pending the outcome of the trial court hearings. If true, these allegations would constitute a serious denial of Corder's Sixth Amendment right to effective assistance of counsel.

■ While we are troubled by these allegations, there are serious problems in ordering such a stay or hearing on the present record. First, this type of allegation is more appropriately dealt with by the district court. Procedurally, several vehicles are available, including Rule 33 of the Fed. R.Crim.P., Motion for a New Trial, or the collateral relief available to federal prisoners under 28 U.S.C. § 2255. Second, examination of the record does not provide clear evidence of the ineffective assistance of counsel, the failures alleged being those of litigation strategy. Nor do we have the impressions and findings of the district judge to guide us.

For these reasons, it would be unwise to order the district court to hold such a hearing. The problem is not ripe for adjudication on the appellate level. If, however, the district court chooses to hold such a hearing, it would be well within its discretion. The judge in this case presided over a trial which took an extensive time period to try, and has, no doubt, formed clear impressions regarding the performance of the counsel concerned.

### Conclusion

The appellants have presented other issues, including claims that the evidence is not sufficient to uphold the convictions. Convictions under 18 U.S.C. §§ 1341, 1343 require a finding that the defendants had the specific criminal intent to commit the fraud, while using the mails or interstate wire communications to further their scheme. *United States v. Bush*, 522 F.2d 641 (7th Cir. 1975), *cert. denied*, 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976). Examining the evidence and record in this case we are convinced that the convictions

must be affirmed. The appellants' other contentions are without merit and are denied.

For all the foregoing reasons, the convictions of these appellants are affirmed.