**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Ivan W. BROWN and Gordon M. Kenngott, Defendants-Appellants.**

Nos. 82–1581, 82–1582.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 6, 1983.

Decided May 4, 1984.

As Amended on Denial of Rehearing In Banc and Rehearing July 10, 1984.

Certiorari Denied Oct. 29, 1984. See 105 S.Ct. 331.

Janet L. Jannusch, Asst. U.S. Atty., Gerald D. Fines-U.S. Atty., Peoria, Ill., for plaintiff-appellee.

Steven Skelton, Bloomington, Ill., Ann C. Tighe, Cotsirilos & Crowley, Ltd., Chicago, Ill., for defendants-appellants.

Before CUMMINGS, Chief Judge, and PELL and WOOD, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

This case is about four people (the two defendants along with two unindicted co-conspirators) who allegedly engaged in a fraudulent loan brokerage business wherein they induced investors into advancing funds for the purchase of so-called "ICC–290 letters of credit," which were not the investments they were represented to be. A jury found both defendants guilty of conspiracy, wire fraud, and interstate transportation of stolen property in violation of 18 U.S.C. §§ 371, 1343, and 2314. The defendants, Ivan W. Brown and Gordon M. Kenngott, separately raise a number of issues on appeal, some of them overlapping. We affirm their convictions.[1]

## I. *Background*

Around 1971, defendant Kenngott formed a business called Kenngott Financial, Ltd., located in Wisconsin. Kenngott was the corporation's sole employee; he assisted companies in merger acquisitions and in obtaining funds. Kenngott met defendant Brown, also from Wisconsin, in June 1979. Brown operated a similar business known as International Barters. The defendants then began working together in arranging loan packages for client projects. Kenngott would supposedly arrange for the source of the funds, and Brown would arrange for the collateral. Kenngott and Brown then became acquainted with and began doing business with Don Johnson and Joseph Synan, two unindicted co-conspirators who were also engaged in the loan brokerage business: Johnson worked under the name Donald G. Johnson & Associates in Kansas, and Synan operated a number of loan brokerage companies, with "finders" located all over the country, in-

---

1. The district judge sentenced both Brown and Kenngott to four years imprisonment and a $10,000 fine on Count I, the conspiracy count; and to three years imprisonment and a $2,500 fine on each of Counts II through V, with imprisonment suspended and probation imposed.

cluding Illinois. Johnson and Synan referred loan packages from their clients to Kenngott and Brown, and had their clients wire money to Kenngott and Brown to purchase ICC–290 letters of credit, which would allegedly guarantee their loans and make them easier to fund. The catch, as the unwitting victims who wired various amounts ranging from $10,000 to $190,000 soon found out, was that there is no such thing as an ICC–290 letter of credit. The ICC–290 is simply a pamphlet published by and readily available from the International Chamber of Commerce to facilitate international trade by establishing certain standard rules and terminology. After hearing a much more detailed version of the scheme, the jury found both Brown and Kenngott guilty of running a fraudulent loan brokerage business.

Brown and Kenngott now complain: (1) that the district judge erred at the *Santiago* Rule 104 hearing when he concluded that there was sufficient evidence of a conspiracy to allow the government to introduce statements at trial of alleged co-conspirators Don Johnson and Joseph Synan; (2) that the district judge erred in refusing to give certain jury instructions tendered by the defendants, and that the instructions finally read to the jury failed to adequately state the law; and (3) that the evidence against the defendants was insufficient to support the verdict. In addition, Kenngott alleges that he was deprived of his constitutional right to effective assistance of counsel at trial, and that the district court lacked jurisdiction because of improper venue, and Brown contends that the prosecutor committed prejudicial error in his final argument.

## II. *Admissibility of Alleged Co-Conspirator Statements*

 Prior to trial the court held a hearing to determine whether certain co-conspirator statements would be admissible against the defendants at trial. *See United States v. Santiago*, 582 F.2d 1128 (7th Cir.1978); Fed.R.Evid. 104. Kenngott and Brown dispute the court's finding that the government proved by a preponderance of the evidence that the defendants participated in a conspiracy, and argue that co-conspirator statements were therefore wrongfully admitted. Although the district court did not outline the evidence upon which it based its finding, there is sufficient, although not overwhelming, circumstantial evidence in the record of the *Santiago* hearing to support the district court's conclusion that it was more likely than not that the two defendants participated along with the two unindicted co-conspirators in a conspiracy to defraud. Direct evidence is not necessary. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Dalzotto*, 603 F.2d 642, 645 (7th Cir.), *cert. denied*, 444 U.S. 994, 100 S.Ct. 530, 62 L.Ed.2d 425 (1979).

*A.* Kenngott focuses his argument around his own asserted innocence, arguing that the unindicted co-conspirator statements were wrongfully admitted against the defendants because the government allegedly failed to present evidence that the defendants themselves were guilty of misrepresentation. After reviewing the record, we find ample evidence of the defendants' active and knowing participation in a conspiracy to defraud.

Don Johnson testified that he began referring clients' loan packages to Brown and Kenngott in the spring of 1979, and that at that time he had conversations with both defendants regarding the "procedures" they used in their loan brokerage business. As Kenngott described his business to Johnson, Kenngott would find actual lenders of funds, and Brown would arrange for necessary collateral. Johnson then had a conversation with Brown, who told Johnson that he used ICC–290 letters of credit to arrange collateral for funding, and that when a client wished to purchase an ICC–290, the money, along with a fee set by Brown, should be sent to Brown.

Joseph Synan testified that he too was engaged in the loan brokerage business, and that he became acquainted with Kenngott and Brown through Don Johnson. Synan described some specific loan

packages that he submitted in 1979 to Kenngott and Brown through Johnson. Synan testified that Johnson, Kenngott, and Brown each advised him that ICC–290 guarantees were necessary to obtain funding for the loan packages. Although the money for the ICC–290s was forwarded to Kenngott and Brown, none of the loans came through. Synan requested on the first occasion that the money be returned, but Kenngott and Brown told him that was impossible because the money had already been used to secure the ICC–290s.

Synan subsequently submitted another loan request to Kenngott and Brown through Johnson for a project referred to as Virco. Synan and Johnson both testified in great detail about the Virco project, one of the specific loan packages that led to the indictment against Kenngott and Brown.

In the fall of 1979 Johnson had a telephone conversation with Brown regarding the amount necessary to purchase an ICC–290 for the Virco loan. Brown told him $190,000 would be required. Johnson also had a telephone conversation with Kenngott regarding funding for the Virco loan. Kenngott told him the funders were ready to go as soon as the collateral was in place, and that the lender would be a person from the Middle East. Johnson relayed this information to Synan and referred the Virco package to Kenngott.

Synan testified that he also spoke directly with Kenngott and Brown about the Virco loan. Kenngott told Synan that the loan was a good one, but that it needed an ICC–290 guarantee before it could be processed and funded. Brown told Synan that $190,000 had to be submitted to secure the ICC–290 guarantee. Synan then had two clients send Brown and Kenngott the $190,-000. As before, the loan was not forthcoming. Also as before, Kenngott told Synan that it was not possible to get a refund because the money had already been used to secure the ICC–290.

Thierry Verhaegen, an attorney with the United States branch of the International Chamber of Commerce, explained what an ICC–290 really is. He testified that it is a set of guidelines designed to help businessmen export goods overseas by using letters of credit. It is not itself a letter of credit that can be purchased by individuals seeking loans. No portion of the document covers the loaning of money or money-changing.

The evidence at the *Santiago* hearing established that Kenngott and Brown completely misrepresented and mischaracterized the nature of an ICC–290, and through their misrepresentations induced unwitting investors found by Johnson and Synan to send money to Kenngott and Brown for the so-called ICC–290. None of the investors ever saw their money again, and the loans that the ICC–290s were to provide collateral for never came through. The natural and allowable inference from the testimony and evidence presented is not, as defendants assert, that Kenngott and Brown simply and innocently used terminology in a way not originally intended by the International Chamber of Commerce, but that Kenngott and Brown misrepresented the nature of an ICC–290 as part of their conspiracy to defraud investors. The evidence at the *Santiago* hearing was circumstantial, as it often is, but it was sufficient to prove that it was more likely than not that Kenngott and Brown created and actively participated in this unique conspiracy to defraud. *Cf. United States v. Kaminski,* 692 F.2d 505, 512 (8th Cir.1982); *United States v. Kreimer,* 609 F.2d 126, 132 (5th Cir.1980); *United States v. Talbott,* 590 F.2d 192, 194 (6th Cir.1978); *United States v. Becker,* 569 F.2d 951, 959–60 (5th Cir.), *cert. denied,* 439 U.S. 865, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978).

*B.* Additionally, however, Brown contends that Synan's and Johnson's statements should not have been admitted because Synan and Johnson do not qualify as co-conspirators with the defendants. Brown argues that there was no evidence of a continuity of interest between Synan and the defendants, and that Johnson was no more than an unknowing conduit between Synan and the defendants.

It is well settled that a written or spoken agreement among alleged co-conspirators is unnecessary; rather, indirect evidence of "[a] mere tacit understanding will suffice." W. LaFave and A. Scott, Jr., *Handbook on Criminal Law* § 61, at 461 (1972) (footnote omitted); *e.g., Iannelli v. United States,* 420 U.S. 770, 777 n. 10, 95 S.Ct. 1284, 1289 n. 10 (1974); *United States v. Hedman,* 630 F.2d 1184, 1192 (7th Cir. 1980); *United States v. Consolidated Packaging Corp.,* 575 F.2d 117, 126 (7th Cir.1978); *United States v. Robinson,* 470 F.2d 121, 123 (7th Cir.1972). Brown admits that Johnson and Synan had a working relationship with each other, and our search of the record reveals sufficient evidence to link Johnson and Synan as co-conspirators with Brown and Kenngott.

Johnson testified that Brown offered him a commission of $5,000 to $10,000 for each client he brought in who purchased an ICC–290. Johnson also testified that he forwarded approximately five to six loan packages to Brown and Kenngott, but that he never heard of any loan package that the defendants ever funded. Synan, who is currently serving time in prison for another felony conviction, forwarded approximately four loan packages to the defendants through Johnson, but admitted on cross-examination that he never heard of an ICC–290 loan package getting funded, that he did not believe the loans would ever be funded, and that he admitted to the FBI that he knew the whole loan brokerage business was a fraud and a sham. Just as the evidence is sufficient to prove that it was more likely than not that Brown and Kenngott joined together in a conspiracy to defraud, the evidence is also sufficient to implicate Johnson and Synan as knowing participants in that conspiracy.

Thus, it was sufficiently shown that the defendants as well as the unindicted co-conspirators joined their various nefarious talents together for the good of their common fraudulent scheme in the expectation of benefiting from it personally. Any other view of the evidence would be naive and unrealistic. All four co-conspirators engaged in some aspect of the loan business; they were not uninformed about what they were doing. To one in the business the ICC–290 must have been recognized as the gimmick it was, successful for the perpetrators of the conspiracy, but not for the investors. Every time an investor sent money to purchase the so-called ICC–290 to serve as collateral for a loan, the loan never materialized, and the ICC–290 money had the unfortunate characteristic of evaporating. Johnson's and Synan's statements are properly admissible under Fed.R.Evid. 801(d)(2)(E). The defendants are now and deserve to be losers along with the victims who contributed the money. We cannot say the findings of fact of the experienced trial judge in this regard were erroneous.[2]

### III. *Jury Instructions*

Brown and Kenngott also both take issue with the district court's refusal to tender the defendants' instructions on good faith and specific intent, and with the way the judge defined "knowingly."

Rule 30 of the Federal Rules of Criminal Procedure states:

> No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.

The record does not reveal that either defendant at any time during the trial voiced the objections he now raises before this court.[3] At the jury instruction conference, the attorneys for both defendants specifically approved the judge's instruction on

---

2. Since we find sufficient evidence to support the trial judge's Rule 104 findings, we need not consider the government's alternative argument that all of the testimony defendants object to is admissible on grounds other than as Fed.R. Evid. 801(d)(2)(E) declarations of co-conspirators.

3. Although the government failed to recognize this problem, after a careful examination of the record, we take note of it on our own.

the definition of "knowingly." And although the defendants submitted proposed instructions on good faith and specific intent, when the judge refused them as being adequately covered in the court's own proposed instructions, the defendants said nothing. Merely submitting instructions is not sufficient to preserve the right to appeal. A defendant must object to the judge's refusal to tender the defendant's instructions, and must clearly state the reasons for his objection. *United States v. Jackson*, 569 F.2d 1003, 1009–10 (7th Cir.), *cert. denied*, 437 U.S. 907, 98 S.Ct. 3096, 57 L.Ed.2d 1137 (1978). Since the defendants failed to do so, we will not reverse unless the errors now alleged amount to prejudicial plain error. Fed.R.Crim.P. 52(b). We conclude that they do not.

 Kenngott first contends that the refusal to give the defendants' good faith instruction deprived the defendants of an instruction on the defense theory of the case. The defendants did not, however, identify the instruction as a theory of the defense instruction when they proffered it. Moreover, as the court noted, the so-called good faith instruction did no more than give the defendants' definition of intent to defraud, a concept the court had already adequately defined.[4] There clearly was no plain error.

 Kenngott also complains that the court should have instructed the jury on specific intent. As Kenngott admits, however, the distinction between specific and general intent tends to confuse juries. Because of this, failure to give a separate instruction on specific intent is not reversible error so long as the court's general instructions on intent sufficiently define the appropriate mental state. *See* Committee on Federal Criminal Jury Instructions of the Seventh Circuit, *Federal Criminal Jury Instructions* § 6.02, at 94 (1980); *see also United States v. Arambasich*, 597 F.2d 609, 611 (7th Cir.1979). Kenngott's reliance on *United States v. Barclay*, 560 F.2d 812 (7th Cir.1977), where we accepted a defendant's complaint that the trial court's failure to instruct on specific intent to defraud required reversal, is misplaced. In *Barclay*, we specifically acknowledged the confusion created by distinguishing between general and specific intent, but reversed and remanded the case because the district court failed to instruct on either specific intent *or* intent to defraud. *Id.* at 818. Judge Baker did not make that mistake here. His instructions on "intent to defraud," "knowingly," and "willfully" adequately accomplished what defendants sought through their proffered instructions on fraudulent intent and specific intent—the judge's charge instructed the jury that defendants must have acted knowingly and with the specific intent to deceive. *See supra* note 4.

 Defendants complain, however, that the last sentence of the court's definition of

---

**4.** The defendants requested the following instruction:

Fraudulent intent is one of the essential elements of the offenses with which the defendants are charged. Fraudulent intent is not presumed or assumed; it is personal and not imputed. One is chargeable with his own personal intent, not the intent of some other person. Bad faith is an essential element of fraudulent intent. Good faith constitutes a complete defense to one charged with an offense of which fraudulent intent is an essential element. One who acts with honest intention is not chargeable with fraudulent intent. One who expresses an opinion honestly held by him or a belief honestly entertained by him, is not chargeable with fraudulent intent even though such opinion is erroneous and such belief is a mistaken belief. Evidence which establishes only that a person made a

mistake in judgment or an error in management, or was careless, does not establish fraudulent intent. In order to establish fraudulent intent on the part of a person, it must be established that such person knowingly and intentionally attempted to deceive another. One who knowingly and intentionally deceives another is chargeable with fraudulent intent notwithstanding the manner and form in which the deception was attempted.

This instruction was approved in *United States v. Ammons*, 464 F.2d 414, 417 (8th Cir.), *cert. denied*, 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 253 (1972).

The trial court's instruction stated: "To act with 'intent to defraud' means to act knowingly and with specific intent to deceive, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to oneself."

"knowingly" negated the requisite specific intent and allowed the jury to convict the defendants even if they did not intend to break the law. Again, we do not see any plain error. Although the court's definition of "knowingly" told the jury that someone may act knowingly without intending to violate a law,[5] we must not read the definition in isolation. *See United States v. Lang,* 644 F.2d 1232, 1240 (7th Cir.) (as amended), *cert. denied,* 454 U.S. 870, 102 S.Ct. 338, 70 L.Ed.2d 174 (1981) ("The question of whether a jury has been properly instructed is to be determined not upon consideration of one single paragraph, sentence, phrase or word, but upon the charge as a whole." (citation omitted)). The court's instructions read as a whole clearly informed the jury that they were not to convict Brown and Kenngott for merely acting "knowingly."[6]

Finally, Brown asserts that the relationship between Johnson and Synan constituted a separate conspiratorial arrangement that should have prompted the court to instruct the jury on the theory of multiple conspiracies. Neither Brown nor Kenngott requested such an instruction, however, and we do not see any plain error in the court's failure to give one. Brown failed to explain how the alleged existence of separate conspiracies and the court's

failure to give a more specific instruction on multiple conspiracies may have confused the jury, or allowed the jury to find Brown and Kenngott guilty for acts in which they were not involved. Brown's unexplained assertion that the court's generalized definition of conspiracy could "easily lead to confusion on the jurors' part" is insufficient to prove prejudice. Without any specific showing of how Brown may have been prejudiced, we will not reverse. *See United States v. Lindsey,* 602 F.2d 785, 787 (7th Cir.1979).

## IV. Ineffective Assistance of Counsel

Kenngott's most serious individual claim is that he was deprived of his constitutional right to "legal assistance which meets a minimum standard of professional representation." *United States ex rel. Williams v. Twomey,* 510 F.2d 634, 641 (7th Cir.), *cert. denied,* 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109 (1975). Since Kenngott did not obtain new counsel until post-trial motions were concluded and after his trial attorney filed for appeal, the district court never had the opportunity to pass on the claim of ineffective assistance. Thus, the first issue we must decide, although the parties themselves did not raise it, is whether we should address the merits.[7]

---

**5.** The court defined "knowingly" as follows: "When the word 'knowingly' is used in these instructions, it means that a defendant realized what he was doing and was aware of the nature of his conduct, and did not act through ignorance, mistake or accident. To act knowingly does not mean that a defendant had to realize he was violating the law."

**6.** For each of counts II–V, the court instructed the jury that they must find that Kenngott and Brown acted "knowingly and willfully," with willfully defined as follows: "The term 'willfully' used in these instructions means deliberately and intentionally as distinguished from careless or inadvertent. As applied to a defendant in the context of this case it means that a defendant must have known and specifically intended his representations or promises to be false and fraudulent when he made them"

For count I, the court told the jury that the defendant must have "knowingly and intentionally became a member of the conspiracy," with conspiracy defined as "a combination of two

and more persons to accomplish an unlawful purpose."

**7.** We have in some instances refused to decide attorney incompetence claims initially raised on appeal. We have not, however, adopted a per se rule that it is never proper to entertain such claims. *See, e.g., United States v. Nero,* 733 F.2d 1197, 1207 (7th Cir.1984) (refused to decide attorney incompetence claim because record not sufficiently developed); *United States v. Jarrett,* 705 F.2d 198, 209 (7th Cir.1983), *petition for cert. filed,* — U.S. ——, 104 S.Ct. 995, 79 L.Ed.2d 228 (1983) (refused to decide attorney incompetence claim where defendant initially raised the claim with the district court, but terminated that proceeding and then attempted to directly raise the issue on appeal); *United States v. Lang,* 644 F.2d 1232, 1240 (7th Cir.) (as amended), *cert. denied,* 454 U.S. 870, 102 S.Ct. 338, 70 L.Ed.2d 174 (1981) (refused to decide attorney incompetence claim where no clear evidence in the record); *United States v. Gray,* 611 F.2d 194, 197 & n. 3 (7th Cir.1979) (per

■ Appellate courts generally refuse to consider issues raised for the first time on appeal. *See, e.g., Hormel v. Helvering,* 312 U.S. 552, 556, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1940); *Sharp v. Ford Motor Credit Co.,* 615 F.2d 423, 424 n. 1 (7th Cir.1980); *United States v. Gray,* 611 F.2d 194, 197 (7th Cir.1979). This is not, however, an inflexible rule, *see, e.g., Singleton v. Wulff,* 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1975) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases."); *United States v. Ward,* 387 F.2d 843, 845 (7th Cir.1967), and we see no reason to make it inflexible in the context of direct appeals of attorney incompetence claims. When both parties ask us to resolve an attorney incompetence issue, when both parties have briefed and argued its merits, when we have the entire trial record before us, and when the benefit of a district court hearing is minimal because proper resolution of the issue is clear, we may, in our discretion, take the opportunity to finally conclude the litigation. *See United States v. Aulet,* 618 F.2d 182, 185–86 (2d Cir.1980); *see also Singleton v. Wulff,* 428 U.S. at 121, 96 S.Ct. at 2877 ("Certainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt ...." (citation omitted)). In exercising our discretion to take such action "as may be just under the circumstances," 26 U.S.C. § 2106, we address the attorney incompetence claim on the merits in this case.[8]

■ In an ineffective assistance of counsel case, the defendant bears the burden of proving that his counsel's representation amounted to " 'grossly incompetent professional conduct,' " *United States v. Weston,* 708 F.2d 302, 306 (7th Cir.1983) (quoting *United States ex rel. Williams v. Twomey,* 510 F.2d 634, 640 (7th Cir.), *cert. denied,* 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109 (1975)), and of showing that the acts or omissions complained of impaired his defense, *United States v. Rain-*

curiam), *cert. denied,* 446 U.S. 911, 100 S.Ct. 1840, 64 L.Ed.2d 264 (1980) (decided that two claims of attorney incompetence were frivolous, but refused to decide third claim because the factual basis in the record was insufficient).

Other circuits that have confronted the issue of when it may be proper to resolve attorney incompetence claims initially raised on appeal have resolved it in different ways. *See, e.g., United States v. Griffin,* 699 F.2d 1102, 1107–09 (11th Cir.1983) (blanket refusal to consider any attorney incompetence claim initially raised on appeal); *United States v. Whitley,* 670 F.2d 617, 621 (5th Cir.1982) (may consider claim only if the record is sufficiently developed); *United States v. Aulet,* 618 F.2d 182, 185–86 (2d Cir. 1980) (may consider claim where both parties ask for a resolution of the issue, the resolution is beyond doubt, and remand to the district court would be a waste of judicial resources); *United States v. Schreiber,* 599 F.2d 534, 538 (3d Cir.1979) (will refuse to consider claim unless the incompetence was so gross that the district court's failure to notice it sua sponte constituted plain error); *United States v. Kazni,* 576 F.2d 238, 242 (9th Cir.1978) (same); *United States v. McCord,* 509 F.2d 334, 352 n. 65 (D.C.Cir.1974) (en banc), *cert. denied,* 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975) (will dismiss claim where the record on appeal conclusively shows that the defendant is not entitled to relief).

8. We emphasize, however, that it is clearly preferable for the district court in which the case was tried to be the first to consider a claim of attorney incompetence. *United States v. Lang,* 644 F.2d 1232, 1240 (7th Cir.), *cert. denied,* 454 U.S. 870, 102 S.Ct. 338 70 L.Ed.2d 174 (1981). The district judge has personally observed the performance of trial counsel, and has the opportunity, if necessary, to call and interview witnesses in a hearing on the issue of incompetence. A district court thus is in a better position to come to a conclusion than is an appellate court, which is limited to analyzing a sterile trial transcript. Therefore, it is better for a defendant to assert his attorney incompetence argument through, for example, a motion to the district court to vacate its judgment, or a habeas corpus petition. We will not consider an incompetence claim not first presented to the district court if there exists any doubt about how the issue should be resolved, or if we believe that further factual findings or development of the record may shed any light on the issue. Furthermore, when a defendant obtains new counsel prior to the conclusion of post-trial motions and the initiation of appeal to this court, we will look more unfavorably on the failure of new counsel to initially raise an incompetence claim before the district court. That, however, is not the situation in this case.

*eri,* 670 F.2d 702, 712 (7th Cir.), *cert. denied,* 459 U.S. 1035, 103 S.Ct. 446, 74 L.Ed.2d 601 (1982); *cf. United States ex rel. Cosey v. Wolff,* 727 F.2d 656, 658 (7th Cir.1984). In the case at hand, Kenngott supports his claim by pointing to specific objections and motions that he says his trial counsel should have made. In examining the totality of the circumstances, *United States v. Phillips,* 640 F.2d 87, 92 (7th Cir.), *cert. denied,* 451 U.S. 991, 101 S.Ct. 2331, 68 L.Ed.2d 851 (1981), and keeping in mind that we will not second-guess tactical or strategic decisions, *United States v. Weston,* 708 F.2d at 306, we do not think Kenngott has met his burden, nor do we think he could if given the further opportunity to pursue his claim before the district court.[9]

■ The first error claimed is the failure of Kenngott's attorney to file pretrial motions. We do not believe, however, that any pretrial motions were necessary. The trial judge issued a comprehensive discovery order soon after the indictment was returned. The government had an open file policy. There is no showing that Kenngott's attorney had difficulty obtaining necessary documents, or that he failed to review them. To the contrary, the facts of this case were complicated, and a review of the trial transcript reveals that his counsel had mastered them.

Kenngott more specifically complains that his counsel should have made pretrial motions with respect to deficiencies in the indictment, alleging that inconsistent dates in the indictment made it confusing and defective, and that the face of the indictment revealed improper venue. We do not agree. The dates within the indictment differ because they relate to different counts charged and different overt acts Kenngott and Brown allegedly committed in furtherance of their conspiracy. Furthermore, as we discuss later, there was no problem with venue.

■ Second, Kenngott complains that his counsel failed to object to the admission of prejudicial "other act" evidence. Kenngott admits that "[p]erhaps such evidence was admissible under Fed.R. Evid. 404(b)," but claims that counsel's failure to require a determination of admissibility or a balancing of the evidence's relevance against its prejudicial impact was "unconscionable." Kenngott's concession that the evidence complained of may have been admissible is fatal to his claim. As noted above, a defendant claiming ineffective assistance of counsel must prove that his attorney's acts or omissions somehow harmed his case. A complaint about the failure to object to the admission of evidence does not begin to make out a colorable claim of ineffective assistance if the complaint fails to allege that the evidence should ultimately have been excluded. There can be no prejudice if the evidence is admissible. Moreover, the failure to object to evidence that though prejudicial, is probably admissible, clearly qualifies as falling within the realm of tactics. Objecting to those two short bits of testimony about Kenngott may have highlighted the "other acts" referred to and caused more harm than quietly letting the testimony slip by. *See United States v. Fleming,* 594 F.2d 598, 607 (7th Cir.), *cert. denied,* 442 U.S. 931, 99 S.Ct. 2863, 61 L.Ed.2d 299 (1979).

---

9. On petition for rehearing and rehearing en banc, Kenngott argues that he has met the standard for ineffective assistance of counsel set forth in *Strickland v. Washington,* — U.S. —, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which was decided after we published this case in slip opinion form. In *Strickland,* the Supreme Court held that to prevail on an ineffective assistance of counsel claim, a defendant must prove that his counsel's representation fell below an "objective standard of reasonableness," and that but for counsel's errors, the result of the proceeding probably would have been different. *Id.* at 2065, 2068. Without deciding whether *Strickland* should have retroactive effect, and without deciding whether the Supreme Court's "objective standard of reasonableness" is equivalent to our standard of "grossly incompetent professional conduct," we note that the result in Kenngott's case would have been the same even under *Strickland* because of Kenngott's failure to show prejudice sufficient to meet the second prong of the *Strickland* test.

■ Third, Kenngott complains that his attorney allowed the prosecution to use tapes of two telephone conversations against Kenngott at trial without attempting to ensure that the government had complied with the requirements of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520. The government claims that the disputed tapes were recordings of consensually monitored telephone calls and therefore were not subject to the Act. Regardless whether the tapes were subject to the Act, Kenngott's attorney's failure to investigate the circumstances surrounding the taping to determine if any valid objections could be raised did not in any way prejudice Kenngott's defense. The government never attempted to admit the tapes into evidence; the government merely used them—out of the presence of the jury—to refresh Kenngott's memory. It was Kenngott's counsel who, after hearing the tapes, decided to play them for the jury.[10] Kenngott does not dispute the propriety of his counsel's decision to play the tapes to the jury. He therefore cannot complain that it was incompetent for his counsel to fail to ensure that the government complied with the requirements of Title III.

■ Fourth, Kenngott alleges that his counsel lacked a sufficient understanding of conspiracy law and consequently failed to properly limit the introduction of certain co-conspirator statements. Again, Kenngott fails to meet his burden of proving that his counsel acted in a way that harmed Kenngott's defense. A general allegation that counsel should have limited the introduction of co-conspirator statements without identifying which statements were admitted that should not have been, is inadequate to support an allegation of attorney incompetence.

■ Finally, Kenngott points out that his counsel did not submit a draft of proposed jury instructions, as did Brown's attorney. The failure to submit instructions does not in itself make out a claim of ineffective assistance. The court did not request a draft of proposed instructions, the government did not submit any, Kenngott does not claim that Brown's proposed instructions were inadequate, and, as we have already explained, the instructions as given were adequate. Defense counsel may have agreed to share some of the trial responsibilities.

Moreover, the failure of Kenngott's attorney to submit instructions does not, as Kenngott implies, show that his attorney failed to vigorously represent Kenngott's interests by sitting back and merely relying on the work of Brown's attorney. Far from sitting back, Kenngott's attorney was always the first to present opening and closing arguments for the defendants, and was always the first attorney to cross-examine the government's witnesses. Kenngott's counsel presented and argued motions for acquittal both at the end of the government's case and at the close of the evidence, with Brown's attorney simply joining in Kenngott's motions. By providing both argument and citations, Kenngott's counsel aided Brown's attorney in the admission of some defense evidence. Moreover, although Kenngott's counsel did not submit any typed instructions, he did specifically request an instruction on good faith during the jury instruction conference, and provided a reference to Devitt and Blackmar.

We have carefully examined the record and have found that Kenngott's attorney participated in every phase of the trial: he interposed timely, frequently sustained objections, conducted extensive cross-examination, presented comprehensible opening and closing arguments to the jury that established a theory of the case, moved and argued for acquittal twice during the trial, moved for mistrial when the jury retired, and made the necessary motions for new trial, stay of execution, and appeal. Kenngott's counsel did not sit back and

---

**10.** Kenngott's counsel even requested that the judge allow the jury to take the tapes with them into the jury room.

watch his client get convicted, as Kenngott now suggests. In fact, when the trial judge asked the government whether the government's final witnesses would be lengthy, the government quipped that it would be up to Kenngott's attorney.

Brown does not complain about his counsel although, since counsel worked together, Brown's counsel might be subject to the same criticisms. Even competent counsel can lose a weak case.

## V. Venue

■ The remaining issues are clearly without merit. First, Kenngott contends that his conviction should be reversed because his case was tried by a court without proper venue. Kenngott alleges that neither he nor Brown committed an overt act in the Central District of Illinois in furtherance of their conspiracy sufficient to establish venue there, and that the defect in venue was apparent from the face of the indictment. However, where the defect in venue can be gleaned from the face of the indictment, objection to venue is waived "if not presented before the close of the Government's case and perhaps if not presented before commencement of the trial." *United States v. McDonough,* 603 F.2d 19, 22 n. 1 (7th Cir.1979) (citation omitted). Since this is the first time Kenngott raised his improper venue claim, we can dismiss it without considering the merits. However, since both Kenngott and the government briefed the merits (the government failed to recognize that Kenngott did not properly reserve the issue for appeal), and since Kenngott also raises the failure to object to venue as an example of attorney incompetence, we will take a brief look at the arguments.

■ Venue is proper in any district in which the offense was begun, continued, or completed. 18 U.S.C. § 3237(a). Proper venue is not limited to districts where the defendants were physically present when they committed unlawful acts. So long as an overt act in furtherance of the conspiracy is intended to have an effect in the district where the case is finally brought, venue is proper. *See, e.g., United States v.*

*Lewis,* 676 F.2d 508, 511 (11th Cir.), *cert. denied,* 459 U.S. 976, 103 S.Ct. 313, 74 L.Ed.2d 291 (1982) (phone call from defendant in Florida to Texas sufficient to establish venue in Texas); *United States v. Cordero,* 668 F.2d 32, 43–44 (1st Cir.1981) (as amended); *United States v. Schmucker-Bula,* 609 F.2d 399, 402 (7th Cir.1980); *United States v. Spiro,* 385 F.2d 210, 212 (7th Cir.1967). Kenngott admits that certain victims of the fraudulent loan brokerage scheme transferred money to Milwaukee from the Central District of Illinois, and that the indictment alleges that the defendants made phone calls to victims in the Central District. Thus, from the face of Kenngott's own brief, it is apparent that venue was proper.

## VI. Prosecutor's Closing Argument

■ Brown alleges that the prosecutor's final argument misstated the law and prejudiced Brown. At the close of his rebuttal, the prosecutor asked the jury to "ask yourselves, did they [the defendants] disprove anything that was existing at the close of the Government's case?" We agree that this was a misstatement and constituted error on the prosecutor's part. Since the prosecutor assuredly knew better, it was at least gross negligence. But we do not agree that the defendants were prejudiced by the comment.

Although the government, for some inexplicable reason, has failed to respond to Brown's facially serious charge, we have examined the record and find that reversal is not warranted. The judge immediately admonished the jury that "[t]he Defendants don't have to disprove or prove a thing. As you will see from the instructions, I want to highlight that for you. The burden is on the Government to prove the elements of the case, so maybe he misspoke or the words slipped in there, but don't get the idea that the Defendants in this case had to disprove a thing. They don't have to disprove anything." That instruction was well said and timely. Moreover, the jury charge, which immediately followed this admonition, again em-

phasized that the burden of proof beyond a reasonable doubt is on the government, and remains on the government throughout the case.[11] Under these circumstances, the prosecutor's comment did not deprive either defendant of a fair trial. If that type of comment, however, appears again in any subsequent case, we may be inclined to view it as more than gross negligence.

### VII. *Sufficiency of Evidence*

Finally, the defendants contend that the record lacks sufficient evidence to sustain their convictions. Brown failed to present any specific argument, but Kenngott claims that the record lacks evidence of specific intent to defraud, and that "although the prosecution may have shown there was no such thing as an 'I.C.C. 290' *bond*, it did not demonstrate by any evidence that the *procedure* referenced by the term was invalid, non-existent, or fraudulent" (emphasis in Kenngott's brief).

Because the government prevailed below, we must consider the sufficiency of the evidence in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). "Only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict." *Brandom v. United States*, 431 F.2d 1391, 1400 (7th Cir.1970).

The evidence was clearly sufficient, as we have already suggested, to support the jury's finding that Kenngott and Brown were guilty beyond a reasonable doubt of all charges. Intent to defraud may be inferred from the circumstances surrounding the defendants' actions. *United States v. Wrehe*, 628 F.2d 1079, 1082 (8th Cir.1980). The testimony

and evidence at trial indicated that both Kenngott and Brown misrepresented the ICC–290 to be an expensive bond or a loan guarantee, not simply a "procedure," as Kenngott now claims. The conclusion that the defendants' misrepresentations were made in furtherance of a scheme to deceive and defraud unsuspecting victims is inescapable. None of the loans were funded, and none of the money advanced by the victims to Kenngott and Brown was ever refunded. *Cf. United States v. Key*, 725 F.2d 1123, 1127–28 (7th Cir.1984) (indirect evidence sufficient for jury to find intent to defraud).

The convictions of both Kenngott and Brown are affirmed.

---

11. The judge specifically instructed the jury that:

> The defendants are presumed to be innocent of the charges against them. This presumption remains with them throughout every stage of the trial and during your deliberations on the verdict, and is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that the defendants are guilty.
>
> The government has the burden of proving the guilt of each defendant beyond a reasonable doubt, and this burden remains on the government throughout the case. The defendants are not required to prove their innocence.