**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Sidney C. LAUGHLIN, Defendant–**
**Appellant.**

**No. 93–6049.**

United States Court of Appeals,
Tenth Circuit.

June 16, 1994.

Charles R. Lucus, Sp. Asst. U.S. Atty., Oklahoma City, OK (John E. Green, U.S. Atty., Oklahoma City, OK, with him on the brief), for plaintiff-appellee.

Stephen Jones (Jeremy B. Lowrey with him on the brief), of Jones & Wyatt, Enid, OK, for defendant-appellant.

Before: ANDERSON, ENGEL *, and KELLY, Circuit Judges.

* Honorable Albert J. Engel, Senior Circuit Judge for the United States Court of Appeals for the Sixth Circuit, sitting by designation.

ENGEL, Senior Circuit Judge.

The principal issues in this appeal are whether the trial court adequately instructed the jury with regard to the requisite *mens rea* for medicaid fraud and, if reversibly erroneous on that score, whether there was a spillover effect which fatally tainted the defendant's mail fraud convictions. While we are compelled to reverse the medicaid fraud convictions for failure to instruct on an essential element of the offense, we hold that the thoroughness and independence of the mail fraud instructions assured against any possible taint "spilling over" from the faulty medicaid fraud instructions.

## I

Defendant Dr. Sidney Laughlin was charged in a fifty-seven count indictment with fifty-three counts of medicaid fraud, in violation of 42 U.S.C. § 1320a–7b(a)(1)(i),[1] and with four counts of mail fraud, in violation of 18 U.S.C. § 1341.[2] A jury found him guilty on fifty-two counts of medicaid fraud and all four counts of mail fraud. He appeals, arguing that: (1) the jury instructions for medicaid fraud were constitutionally defective in that they did not adequately inform the jury of the requisite *mens rea*, (2) the constitutional error in the medicaid instructions "spilled over" into the mail fraud convictions necessitating reversal of the mail fraud counts, (3) the evidence was insufficient to convict on certain specific medicaid fraud counts, (4) the trial court erred in its sentencing determination that Dr. Laughlin's fraudulent activity created a risk of serious bodily injury through the alleged scheme to defraud, and (5) the trial court erred in its sentencing calculation of loss for purposes of reimbursement.

Dr. Laughlin operated an obstetrics/gynecology clinic in Shawnee, Oklahoma. The allegations of medicaid fraud stem from claims for reimbursement for the treatment of six patients at this clinic. The charges are based on allegations that Dr. Laughlin fraudulently double-billed for related procedures, falsely claimed that a series of procedures were necessitated by "accidents at home," and fraudulently billed medicaid for other random procedures that he did not perform. The mail fraud charges relate to the alleged mailing of false claims to facilitate reimbursement for these procedures. All other relevant facts will be revealed at the appropriate time in this opinion.

## II

■ Dr. Laughlin's first claim on appeal is that the trial court erred in not instructing the jury that he must either have known that the claims being submitted were false or have submitted his claims with the intent to defraud or deceive. Because "knowledge of falsity" is a specific and necessary element of this offense, and because the jury was not instructed that it had to find this element in order to convict, we reverse Dr. Laughlin's fifty-two count medicaid fraud conviction.

■ Initially, we hold that in accordance with the Ninth Circuit in *United States v. Larm*, 824 F.2d 780 (9th Cir.1987), "knowledge of falsity" is an essential element of medicaid fraud pursuant to 42 U.S.C. § 1320a–7b(a).[3] At oral argument, counsel for the government, in defining the elements

---

1. The statute reads, in pertinent part:

   (a) Whoever—
   knowingly or willfully makes or causes to be made any false statement or representation of material fact in any application for any benefit or payment under a State health care program ... shall (i) in the case of such a statement, [or] representation ... by any person in connection with furnishing (by that person) of items or services for which payment is or may be made under the program, be guilty of a felony....

2. The statute reads, in pertinent part:

   "Whoever, having devised or intending to devise any scheme or artifice to defraud ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or think whatever to be sent or delivered by the postal service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the discretion thereon...."

3. As then Circuit Judge Kennedy stated: "It remains to be shown also that the Larms knew of the falsity, for an element of the crime is the specific intent to make a false statement." *Larm*, 824 F.2d at 783.

of the offense, expressly, and we think properly, conceded that the defendant must not only have made false claims, but he must have known at the time he was making such claims that they were, in fact, false.[4] The legislative history, to which we look to discern the *mens rea* for a specific offense, *Liparota v. United States,* 471 U.S. 419, 424, 105 S.Ct. 2084, 2087, 85 L.Ed.2d 434 (1985); *United States v. Bailey,* 444 U.S. 394, 406, 100 S.Ct. 624, 632, 62 L.Ed.2d 575 (1979), supports the conclusion of the *Larm* court and the concession by the government. *See* H.R.Rep. No. 393, 95th Cong., 1st Sess., pt. II, at 47–48 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3039, 3050.[5] We therefore hold, in a question of first impression before this circuit, to be convicted of medicaid fraud, pursuant to 42 U.S.C. § 1320a–7b(a), a defendant must know that the claims being submitted are, in fact, false. We are left to decide whether the jury in our case, based on the actual instructions given, was capable of making such a finding. After a thorough review of the instructions, both oral and written, we are not confident that the jury either made or was capable of making this finding.

Over the objection of the defense, the trial court instructed the jury, both orally and in specific written instructions taken back to the jury room, as follows:

### INSTRUCTION *11 MEDICAID FRAUD— ·ESSENTIAL ELEMENTS*

Three essential elements are required to be proved in order to prove the offenses of medicaid fraud as charged in Counts 1–53 of the indictment:

4. The following colloquy occurred during oral argument:

> JUDGE KELLY: Do you agree that the defendant had to know that the claim as made was false as opposed to merely knowing the claims were made?
> GOVERNMENT: Yes, Your Honor.

5. The legislative history speaks in terms of an "intentional deception or misrepresentation" as the type of fraud that this statute seeks to combat, and of "practitioners that *choose to cheat*" as the type of practitioner who is at risk of running afoul of this law. H.R.Rep. No. 393, at 47–48 (emphasis added).

First: That the defendant made or caused to be made a statement or representation of material fact in an application for benefits or payment under the Medicaid Act;

Second: That the statement or representation was false; and

Third: That the defendant knowingly and willfully made or caused to be made the false statement or representation.

In order to convict the defendant, all 12 of you must agree that a material statement or representation in each count is in fact false.

Unless the government has proved the same false statement to each of you, you must acquit the defendant of the charge in that particular count of the indictment.

The above charge was incomplete and insufficient because it failed to apprise the jury that the statement must not only be false but that Dr. Laughlin must also have known that the statement was false when the claim was submitted. The jury, therefore, could have convicted Dr. Laughlin without considering whether he knew that the claims he was submitting were false.

A proper instruction could have been made simply by adding knowledge of falsity as a fourth element or appending knowledge of falsity to any one of the three cited elements in one of the following ways:

First: That the defendant made or caused to be made a statement or representation of material fact in an application for benefits or payment under the Act *which he then and there knew to be false,* or

Second: That the statement or representation was false *as the defendant knew,*[6] or

6. We find *United States v. Irwin,* 654 F.2d 671 (10th Cir.1981), *cert. denied,* 455 U.S. 1016, 102 S.Ct. 1709, 72 L.Ed.2d 133 (1982), instructive in helping us to fashion this example. Defendant Irwin was charged with violating 18 U.S.C. § 1001 and 18 U.S.C. § 1002 for "willfully and knowingly making or causing to be made a false statement as to material facts in the EDA grant application...." *Id.* at 675. The charge was derived from a statute that is very similar to the statute in question in our case. The Tenth Circuit held that: "[t]he essential elements which the Government must prove in a false statement prosecution under Section 1001 are that (1) the defendant made a statement; (2) the statement was false, fictitious or fraudulent *as the defendant*

Third: That the defendant knowingly and willfully caused to be made the false statement or representation *knowing it to be false when he made the claim.*

Any such variation would have been fully adequate to apprise the jury of the *mens rea* element of the offense. The trial court could also have rectified the error by adding an additional independent instruction defining a false statement or representation in a manner similar to that elucidated in the above examples.[7]

■ The absence of a specific instruction on knowledge of falsity is in our judgment fatal. Failure to instruct on such an essential element as intent or knowledge requires reversal because the "Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). *See also Cole v. Young,* 817 F.2d 412, 424 n. 8 (7th Cir.1987) ("Indeed every federal court to consider the question since the Court decided *In re Winship* ... has agreed that a conviction procured without any jury instruction on an essential element of the offense is constitutionally invalid.").

Dr. Laughlin did not specifically request an instruction in any of the forms as listed above. Nonetheless he did object to the instruction as given and requested an instruction which stated that the jury could only convict if "the defendant knowingly and willfully made or caused to be made the false statement or representation with the specific intent to violate the law or, in the alternative, with the intent to violate the law." When this instruction was denied, he asked that the instruction with regard to the medicaid fraud counts mimic the instruction with regard to the mail fraud counts, so that the jury would be made aware that he had to "act with the specific intent to deceive."

The trial court rejected Dr. Laughlin's proffered instructions on the basis that a "specific intent" charge has been disfavored since *Liparota,* and that the essential elements of the crime, as listed in the instructions, when read in conjunction with the definitions of "knowingly" and "willfully," were sufficient to apprise the jury of the correct *mens rea* for medicaid fraud.

The trial court was correct that instructing in terms of "specific intent" has been disfavored by the courts because of the confusing and ambiguous nature of such an instruction. *Liparota,* 471 U.S. at 433 n. 16, 105 S.Ct. at 2092 n. 16; *Bailey,* 444 U.S. at 403, 100 S.Ct. at 631 (characterizing the distinction between general and specific intent as "ambigu[ous]" and as "the source of a good deal of confusion"); *United States v. Valencia,* 907 F.2d 671, 681–82 n. 12 (7th Cir.1990). In so recognizing, however, the trial court either misread or at least overextended *Liparota,* as not requiring any instruction whatever on the mental state required for a violation of medicaid fraud. *Liparota,* in qualifying the utility of the specific intent instruction,[8] in no way relieved trial courts of their responsibili-

---

knew; (3) the statement was made knowingly and willfully; (4) the statement was within the jurisdiction of the federal agency; and (5) the statement was material." *Id.* at 675–76 (emphasis added).

7. These examples are, of course, not the only acceptable instructions, for numerous permutations will suffice; we merely offer several options for instructive purposes.

8. *Liparota,* citing *United States v. Arambasich,* 597 F.2d 609, 613 (7th Cir.1979), held that a "more useful instruction might relate specifically to the mental state required ... and eschew use of difficult legal concepts like 'specific intent' and 'general intent.'" *See also United States v. Brown,* 739 F.2d 1136, 1143 (7th Cir.), *cert. denied* 469 U.S. 933, 105 S.Ct. 331, 83 L.Ed.2d 268 (1984). The idea of replacing specific or general intent instructions with instructions specifically tailored to the *mens rea* for the respective offense is consistent with the approach recommended by numerous circuits that have drafted pattern jury instructions. *See, e.g.,* FEDERAL CRIMINAL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT § 6.02 (1980) ("The Committee recommends avoiding instructions that distinguish between 'specific intent' and 'general intent'.... [and instead] recommends that instructions be given which define the precise mental state required by the particular offense charged."); PATTERN CRIMINAL JURY INSTRUCTIONS, U.S. SIXTH CIRCUIT § 2.07 (1991) ("This approach is consistent with the approach recommended by all of the circuits that have drafted pattern instructions.") (citations omitted).

ty to define each element of the offense clearly and accurately.

■ All the same, the government insists that the essential *mens rea* element was unmistakably covered by the court's charges elsewhere in the instructions. It is of course true that we review jury instructions in their entirety, *United States v. Denny*, 939 F.2d 1449, 1454 (10th Cir.1991), under a *de novo* standard of review. *United States v. Agnew*, 931 F.2d 1397, 1407 (10th Cir.1991). In so doing, we analyze, in light of the record, whether the instructions state the governing law and whether the jury was provided an intelligent, meaningful understanding of the applicable issues and standards. *United States v. Cardall*, 885 F.2d 656, 673 (10th Cir.1989) (citations omitted). We reverse only if in light of these considerations there was prejudicial error. *Id.* An analysis of the instructions in the form given convinces us that the jury could seriously have been misled in its understanding of the issues and law applicable to the case before it.

In a further attempt to define the *mens rea* element, the trial judge instructed the jury that:

### INSTRUCTION *9* "KNOWINGLY AND WILLFULLY"—DEFINED

A defendant acted "knowingly" when he was conscious and aware of his actions, realized what he was doing or what was happening around him, and did not act because of ignorance, mistake, or accident.

A defendant acted "willfully" when he knowingly performed an act, deliberately and intentionally, as contrasted with accidentally, carelessly, or unintentionally.

This general definition of "knowingly and willfully," however, is not helpful if the jury is never adequately instructed what elements of the statute these terms modify. The jury here was never instructed what Dr. Laughlin had to know and may very well have been left with the same uncertainty that bothered

the Supreme Court in *Liparota.* Commenting upon this disquieting ambiguity, Justice Brennan cited W. LaFave & A. Scott, Criminal Law § 27 (1972):

"Still further difficulty arises from the ambiguity which frequently exists concerning what the words or phrases in question modify. What, for instance, does 'knowingly' modify in a sentence from a 'blue sky' law criminal statute punishing one who 'knowingly sells a security without a permit' from the securities commissioner? To be guilty must the seller of a security without a permit know only that what he is doing constitutes a sale, or must he also know that the thing he sells is a security, or must he also know that he has no permit to sell the security he sells? As a matter of grammar the statute is ambiguous; *it is not at all clear how far down the sentence the word 'knowingly' is intended to travel—whether it modifies 'sells,' or 'sells a security,' or 'sells a security without a permit.'* "

*Liparota,* 471 U.S. at 424 n. 7, 105 S.Ct. at 2087 n. 7 (emphasis added).

On this record, we cannot confidently know whether the jury convicted Dr. Laughlin for: (1) knowing that he was making or causing claims to be made, or (2) knowing that the claims he was making or causing to be made were, in fact, false. *See Sandstrom v. Montana,* 442 U.S. 510, 526, 99 S.Ct. 2450, 2460, 61 L.Ed.2d 39 (1979) ("[E]ven if a jury *could* have ignored the presumption [as to intent] and found defendant guilty because he acted knowingly, we cannot be certain that this is what they *did* do.") (emphasis in original). Without such confidence, it would be grossly unfair to uphold Dr. Laughlin's conviction for medicaid fraud.

It is true that a review of the instructions, both oral and written, reveals that the indictment as sent to the jury in the written instructions contains an accurate description of the *mens rea* for medicaid fraud.[9] This

---

**9.** The indictment, on page two, states:
That on or about the dates set forth hereinafter, in the Western District of Oklahoma, SIDNEY C. LAUGHLIN, the defendant herein, knowingly and wilfully made and caused to be made false statements and representations of

material facts in applications for payments of Medicaid funds for physician services in that the defendant, SIDNEY C. LAUGHLIN, stated and represented that he had provided specific physician services, identified in part by procedure code numbers, on the dates indicated,

might persuade us to overlook the shortcomings of the medicaid fraud instructions. However, after careful consideration of the wording of the indictment, the context in which the indictment was received, and the absence of any other instruction corroborating or clarifying the *mens rea* element as it is contained in the indictment, the faulty jury instructions read as a whole remain glaringly deficient.

Unlike the remainder of the instructions, the indictment, although listed as Instruction 3, was not read verbatim to the jury but was summarized by the trial judge. This summary did not include the *mens rea* description. Thus, any arguably curative effect of the actual language in the indictment was minimized by the judge's instructions as given. The utility of the indictment was further qualified by the judge's statement that "the indictment itself is not evidence, it merely describes the charges and is only an accusation."

Even had the trial judge read the indictment to the jury verbatim, it is our judgment that the inclusion of the knowledge of falsity element, embedded in eighteen lines of text, reproduced in footnote 9, *supra,* does not adequately remedy the judge's failure to incorporate the correct *mens rea* into the appropriate instructions.[10] We cannot be confident that a reasonable juror, having read and heard the indictment, would have identified the contradiction, rectified it in a manner inconsistent with the judge's explicit "element" instructions, and determined that Dr. Laughlin was required to know that the statements he was submitting were, in fact, false. Again, without such confidence, we cannot affirm Dr. Laughlin's medicaid fraud convictions.

We hold that the trial judge committed prejudicial error with regard to the faulty jury instructions on medicaid fraud. The risk of misunderstanding is simply too sub-

stantial to be ignored. We thereby reverse Dr. Laughlin's convictions on counts 1–33 and 35–53.

### III

■ Dr. Laughlin's next claim on appeal is that the error with regard to the jury instructions on the medicaid counts "spilled over" into the mail fraud counts, impermissibly tainting the mail fraud convictions pursuant to 18 U.S.C. § 1341. Although three of the mail fraud counts were predicated on acts of medicaid fraud, we can identify no such spillover effect. The trial judge's instructions on mail fraud were complete in every particular including the requisite statutory *mens rea.* The jury was thus provided with an ample understanding of the applicable issues and standards, as required by *United States v. Cardall,* 885 F.2d at 673. We do not believe that the absence of an element in the medicaid fraud instructions induced the jurors to abandon the independent and adequate mail fraud instructions they received.

The trial judge exercised great care in separating the instructions on the two distinct offenses. The jury were instructed that "[e]ach crime charged and the evidence applicable to it should be considered separately, and the *guilt or innocence of the defendant as to each count should be considered separately.*" (emphasis added). We can be confident that the jury heeded instructions such as this because the jury, in considering the medicaid fraud counts, exercised their authority and dismissed one of the fifty-three medicaid fraud counts—indicating, with some assurance, that the jury scrutinized each count separately and distinctly.

It might even be logically argued that some of the instructions given on the mail fraud charges were so clear that the jury must perforce have been led to believe that

and that certain patients had accidents and injuries at home on the dates indicated, whereas SIDNEY C. LAUGHLIN, *the defendant herein, then and there well knew said statements and representations on the application forms submitted were false* in that he had not provided the physician services as described and identified by the procedure code numbers, on

the dates stated, and that the patients did not have accidents and injuries at home on the dates stated, which misrepresentations were material. (emphasis added).

10. If anything, the existence of the correct *mens rea* merely points out how easy it would have been to instruct the jury on that same element.

the requirements to convict under mail fraud, including the *mens rea* element of intent to deceive or defraud, would apply to the fifty-three medicaid fraud counts. Again, however, because of their distinct treatment in the instructions, we believe it would be as improper for us to hold that the instructions on the first fifty-three counts were "cured" by the instructions on the last four as it would be to hold the opposite. Accordingly, the convictions of Dr. Laughlin on the four counts of mail fraud are affirmed.

## IV

■ At sentencing, the trial court increased Dr. Laughlin's offense level two points, pursuant to U.S.S.G. § 2F1.1(b)(4), for having performed unnecessary surgical procedures, pursuant to a fraudulent double-billing scheme, which resulted in a "risk of serious bodily injury." This guideline provision deals solely with fraud and deceit offenses—both mail fraud and medicaid fraud fall within the grasp of this enhancement provision. United States Sentencing Guideline § 2F1.1(b)(4) provides that:

> If the offense involved the conscious or reckless risk of serious bodily injury, increase by 2 levels. If the resulting offense level is less than level 13, increase to level 13.

The term serious bodily injury is defined in U.S.S.G. § 1B1.1, comment. (n. 1(j)):

> "Serious bodily injury" means injury involving extreme physical pain or the impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation. As used in the guidelines, the definition of this term is somewhat different than that used in various statutes.

The risk of "serious bodily injury" identified by the district court pertains to unnecessary surgery performed on one patient in particular—Tammy Mansfield. This unnecessary surgery formed the predicate act for one of the mail fraud convictions which we uphold today.

Dr. Laughlin chose to perform a tubal ligation (a sterilization procedure) on Tammy Mansfield four weeks after he delivered her child by caesarian section. Testimony at trial indicated that this choice was abnormal, as most doctors would have performed the sterilization procedure concurrently with the caesarian section. Subsequent and due, in part, to the second operation, Ms. Mansfield developed an ileus (distended abdomen) and had to be hospitalized a third time so that this condition could be treated. The development of the ileus can be traced, as even Dr. Laughlin admitted, to the unnecessary second operation.

Dr. Laughlin argued that the evidence was insufficient to justify the conclusion that he performed this procedure several weeks following the caesarian section so that he could double-bill for surgical procedures. He points to Dr. Lampert's testimony, which, according to Dr. Laughlin, merely brought into question Dr. Laughlin's decision to wait four as opposed to six to eight weeks following the caesarian to do the tubal litigation. Dr. Laughlin argues that this testimony evidences only a disagreement concerning operation strategy, not a fundamental error with regard to appropriate procedure, and only proves that, at the very most, his decision might be controversial but in no way was designed to perpetrate a fraud.

The government draws a different conclusion from Dr. Lampert's testimony; it is a conclusion which under the totality of the evidence is supported by the greater force of logic. The government points out that Dr. Lampert testified that: (1) normally a tubal ligation is performed at the same time as a caesarean section; (2) there was no medical reason not to have performed the procedure on Tammy Mansfield when the caesarian was done; and, (3) it would be difficult to find a doctor to defend Dr. Laughlin's actions with regard to his decision to wait before performing the related tubal ligation procedure.

According to further testimony by other witnesses, Dr. Laughlin was aware that he could not be paid twice if he performed the tubal ligation at the same time as the caesarian. Furthermore, Dr. Laughlin's reason for not concurrently performing the surgical procedures in question—that he wanted to provide time for Tammy Mansfield to heal—was

called into question by Dr. Lampert who testified that Dr. Laughlin performed the procedure at a time at which the caesarian could not have properly healed.

We are satisfied that the trial judge committed no error, and certainly no clear error, *United States v. Harris,* 903 F.2d 770, 778 (10th Cir.1990), when she found that the second operative procedure was unnecessary and caused one of Dr. Laughlin's patients to develop an ileus, requiring a subsequent third trip to the hospital. The evidence was fully sufficient to permit the jury to find that Dr. Laughlin made the decision to postpone the tubal ligation pursuant to a fraudulent double-billing scheme which was facilitated by his use of the mails. Dr. Laughlin's fraudulent activity therefore caused a risk of serious bodily injury to Ms. Mansfield, and the trial court's decision to enhance his base offense level by two points should, therefore, be upheld pursuant to U.S.S.G. 2F1.1(b)(4).

For the foregoing reasons, the medicaid fraud convictions are REVERSED and REMANDED for new trial or further proceedings consistent herewith. The mail fraud convictions are AFFIRMED.

ANDERSON, Circuit Judge, dissenting.

I agree that 42 U.S.C. § 1320a–7b(a)(1) requires proof that Laughlin knew the statements were false. I dissent because the jury instructions as a whole correctly explained the meaning of "knowingly and willfully." *See United States v. Denny,* 939 F.2d 1449, 1454 (10th Cir.1991) (explaining that court must review adequacy of jury instructions as a whole, rather than reviewing individual instructions separately).

## I. Knowledge of Falsity

Contrary to Laughlin's assertion, the district court did not fail to instruct the jury on the knowledge of falsity requirement. Instruction Eleven identified "three essential elements" of Medicaid fraud:

First: That the defendant made or caused to be made a statement or representation of material fact in an application for benefits or payment under the Medicaid Act;

Second: That the statement or representation was false; and

Third: That the defendant knowingly and willfully made or caused to be made the false statement or representation.

Appellant's Br.App. at 88. Like the statute itself, however, the third element's description of the necessary intent was ambiguous. It could mean that Laughlin knowingly made a statement that happened to be false, even if he did not know it was false. Or it could mean that Laughlin knew that the statement he was making was false. *See Liparota v. United States,* 471 U.S. 419, 423–24 & n. 7, 105 S.Ct. 2084, 2086–87 & n. 7, 85 L.Ed.2d 434 (1985).

The jury almost certainly understood the instruction correctly. The first element already required proof that Laughlin made or caused to be made a statement. I doubt that a jury would think one could make a statement without knowing that he was doing so. "Knowingly" in the third element could only add the requirement that Laughlin knew the statement he was making was false.

Instruction Nine further guaranteed that the jury would correctly understand the intent element by defining "knowingly" as acting with awareness and not because of ignorance or mistake. *See* Appellant's Br.App. at 86. A reasonable juror would conclude that a defendant who intentionally made a statement but did not know it was false was acting in ignorance. Although plausible to lawyers, I doubt that any reasonable juror would think that a person who did not know his statement was false "knowingly made a false statement."

Nevertheless, our precedents do suggest that this technical ambiguity makes the intent instruction alone inadequate. *See United States v. O'Brien,* 686 F.2d 850, 851–53 (10th Cir.1982); *Hunt v. Oklahoma,* 683 F.2d 1305, 1308 (10th Cir.1982). But flaws in jury instructions are only errors if the instructions as a whole do not "provide the jury with an ample understanding of the applicable principles of law and factual issues." *Denny,* 939 F.2d at 1454. The indictment contained in Instruction Three clarified the correct understanding of Instruction Eleven on the re-

quired knowledge of falsity. The indictment in Instruction Three states that

> Sidney C. Laughlin ... knowingly and wilfully made and caused to be made false statements and representations of material facts in applications for payments of Medicaid funds for physician services in that the defendant ... represented that he had provided specific physician services ... and that certain patients had accidents and injuries at home ..., whereas Sidney C. Laughlin, the defendant herein, then and there well knew said statements and representations on the applications forms submitted were false....

Appellant's Br.App. at 67. Laughlin agreed to have the judge summarize the indictment rather than read it to the jury, but the judge nevertheless told the jury to "read and review it carefully." R.Supp. at 4–5. The indictment can and in this case did help to explain the required intent. *See Hunt*, 683 F.2d at 1308 ("[T]he mere use of the word 'knowingly' in the Information and jury instructions did not adequately convey the concept of scienter to the jury."). The jury knew it should interpret each instruction in light of other instructions because the judge told the jury to "consider the instructions as a whole and not a part to the exclusion of the rest." R.Supp. at 13. Especially since the jury was likely to understand the intent instruction correctly, the indictment's clear allegation that Laughlin knew the statements were false was enough to ensure that the jury would understand it could convict Laughlin only if he knew the statements were false.

I don't see how the "utility of the indictment was further qualified by the judge's statement that 'the indictment itself is not evidence, it merely describes the charges and is only an accusation.'" Majority Op. at 1529. This is true of all instructions. None is "evidence"; they simply describe what the government must prove. The judge's remark does not suggest that the indictment may not clarify what the government must prove.

The majority concludes that Instruction Three did not sufficiently clarify the required knowledge of falsity because "[w]e cannot be confident that a reasonable juror, having read and heard the indictment, would have identified the contradiction, rectified it in a manner inconsistent with the judge's explicit 'element' instructions, and determined that Dr. Laughlin was required to know that the statements he was submitting were, in fact, false." *Id.* However, Instruction Three did not contradict Instruction Eleven. Instruction Eleven clearly required Laughlin to have known something when he made the false statements. One of the possible meanings—in fact, the most likely meaning—of the third element in Instruction Eleven was just what the indictment in Instruction Three alleged: that Laughlin knew his statements were false. Instruction Three therefore simply clarifies the ambiguity in Instruction Eleven; they do not conflict at all. The jury would have no reason to disregard Instruction Three and the judge's admonition to follow all of the instructions. *See* R.Supp. at 4.

The majority also suggests that the jury would not have correctly understood the knowledge requirement because the judge did not read the relevant part of the indictment, which was "embedded in eighteen lines of text." Majority Op. at 1528–29. The mere density of an instruction does not make it inadequate. We may assume that the jury followed the judge's instructions to read the indictment carefully, regardless of what he read orally. Instructions Three and Eleven, along with Instruction Nine, adequately informed the jury that Laughlin was guilty only if he knew the statements were false.

## II. Willfullness

The statute requires proof that the defendant both "knowingly" and "willfully" made or caused to be made a false statement. 42 U.S.C. § 1320a–7b(a)(1). Laughlin claims that the court did not properly instruct the jury on the willfullness requirement either. The majority did not have to consider this challenge because it held that the court did not adequately instruct the jury on knowledge of falsity. I believe that the instructions did convey the correct understanding of the willfullness requirement.

I disagree with Laughlin that the Medicaid fraud statute requires proof that the defen-

dant intended to violate a known law. The accused generally need not know that his conduct is illegal. *Cheek v. United States*, 498 U.S. 192, 199, 111 S.Ct. 604, 609, 112 L.Ed.2d 617 (1991); *United States v. Dashney*, 937 F.2d 532, 538 (10th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 402, 116 L.Ed.2d 351 (1991). But in some cases, such as those involving the criminal tax laws, "willfully" means an "intentional violation of a known legal duty," because of the complexity of the laws or the apparent innocence of the criminal conduct. *See Cheek*, 498 U.S. at 199–201, 111 S.Ct. at 609–610; *Dashney*, 937 F.2d at 539. In this case, however, making known false statements is not apparently innocent. The law may be somewhat complex, but the required knowledge of falsity itself ensures that the accused will not be convicted if he did not know the law and regulations well enough to know that his statements were false. The defendant need not know that filing false claims is against the law, however. *See United States v. Hollis*, 971 F.2d 1441, 1451–52 (10th Cir.1992) (holding that "willfully" in 18 U.S.C. § 2(b) does not require that defendant knew his conduct violated the law), *cert. denied,* — U.S. —, 113 S.Ct. 1580, 123 L.Ed.2d 148 (1993); *Dashney*, 937 F.2d at 538–39 (holding that "willfully" in antistructuring law means only that person intentionally and knowingly evaded the reporting requirement, not that he also knew evasion is illegal). He need only intend to make statements he knows are false.

The instructions ensured that the jury would not convict Laughlin unless he "willfully" made false statements in this sense. The instructions require the jury to find that Laughlin "knowingly and willfully made or caused to be made the false statement or representation." Appellant's Br.App. at 88. The court also explained that "willfully" means Laughlin "knowingly performed an act, deliberately and intentionally, as contrasted with accidentally, carelessly, or unintentionally." *Id.* at 86. Again, the court's description of the willfullness requirement is technically ambiguous. It could mean only that Laughlin intended to make a statement, or that he intended to make a false statement. The required knowledge of falsity makes this ambiguity inconsequential, however. The instructions require that Laughlin knew the statements were false, and that he "willfully" or "intentionally" made those statements that he knew to be false. This is all that "willfully" means in this statute. The instructions as a whole thus adequately instructed the jury on the correct meaning of the charge that Laughlin "knowingly and willfully" made false statements. I therefore dissent.