F I L E D
United States Court of Appeals
Tenth Circuit

DEC 30 2004

PATRICK FISHER
Clerk

**PUBLISH**

# UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

UNITED MINE WORKERS OF
AMERICA, INTERNATIONAL
UNION,

 Plaintiff-Appellee,

v.

RAG AMERICAN COAL
COMPANY; MIDWEST COAL
COMPANY; PLATEAU MINING
CORPORATION,

 Defendants-Appellants,

and

CYPRUS WESTERN COAL
COMPANY,

 Defendant,

v.

PLATEAU MINING CORPORA-
TION; MIDWEST COAL COMPANY,

 Plaintiffs-Appellants,

v.

INTERNATIONAL UNION, UNITED
WORKERS OF AMERICA;
DISTRICT 22, UNITED MINE

No. 02-1456

WORKERS OF AMERICA; LOCAL
UNION NO. 1681, UNITED MINE
WORKERS OF AMERICA,

Defendants-Appellees.

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 97-Z-374)**

---

Forrest H. Roles, of Dinsmore & Shohl LLP, Charleston, West Virginia, (W. Gregory Mott, of Ogletree, Deakins, Nash, Smoak & Stewart, Washington, D.C., with him on the briefs), appearing for the Defendants-Appellants.

Deborah Stern, United Mine Workers of American International Union, Fairfax, Virginia (Richard Rosenblatt, of Boyle, Tyburski & Rosenblatt, Englewood, Colorado, with her on the brief), appearing for Plaintiff-Appellee.

---

Before **SEYMOUR**, Circuit Judge, **McKAY,** Senior Circuit Judge, and **McCONNELL,** Circuit Judge.

---

**SEYMOUR**, Circuit Judge.

This dispute arises out of a collective bargaining agreement (CBA) between the United Mine Workers of America (UMWA) and Amax Coal Company (Amax Coal).[1] In 1993, the UMWA and Amax Coal signed the National Bituminous Coal Wage Agreement (NBCWA), which required Amax Coal to include in any sale of its operations contract terms mandating that the purchaser assume Amax Coal's obligations under the NBCWA. In 1996, Amax Coal sold a coal preparation plant to Cyprus Plateau Mining Company (Cyprus Plateau) but did not include in the terms of the sale provisions for the assumption of Amax Coal's NBCWA obligations. By that time, both Amax Coal and Cyprus Plateau were wholly owned subsidiaries of a common parent company, Cyprus Amax Minerals Company (Cyprus Amax). Shortly after the plant's sale, the UMWA filed suit in federal court alleging that Amax Coal breached its contract with the UMWA and that Cyprus Plateau and Cyprus Amax tortiously interfered with that contract under Colorado law. A bifurcated trial followed, and a jury found for the UMWA on both claims. The parties then settled damages by stipulation. Amax Coal, Cyprus Plateau, and Cyprus Amax appeal the judgments against them. We affirm in part and reverse in part.

---

[1]Defendant company, its parent, and its parent's subsidiaries have changed names frequently. In this opinion, we use the company names applicable at the time the relevant events took place.

# I

The coal preparation plant at issue in this case, the Castle Gate Plant, is located in central Utah. Prior to 1979, the Bratzah Corporation, a signatory to the 1974 NBCWA, owned the plant and adjacent Castle Gate Mines. Bratzah sold both the plant and the mines in 1979 to Price River Coal Company, which assumed Bratzah's NBCWA obligations pursuant to the CBA's successorship clause. Price River operated the facilities for several years, but closed them in 1984. Two years later, Price River sold them to Amax Coal. Amax reopened the Castle Gate Mines and the preparation plant and assumed Price River's obligations under the NBCWA. As required by the agreement, Amax Coal recalled UMWA workers, formerly Price River employees, to staff the facilities.

Geological complications at the Castle Gate Mines led to their closure in 1989. The Castle Gate Plant, while operational, had no coal to process without the Castle Gate Mines. Consequently, the plant closed as well. Amax Coal began looking for a buyer for all of its operations at the Castle Gate site, whether as separate mining and preparation facilities or as a whole. In 1990, Amax Coal first approached Cyprus Plateau about purchasing the Castle Gate Plant, but Cyprus Plateau was not interested.

While the Castle Gate Mines declined in productivity, Cyprus Plateau's nearby Star Point Mine enjoyed success. A new market for Cyprus Plateau's coal

opened in the Pacific Rim, and in the late 1980s and early 1990s, Cyprus Plateau began searching for additional coal reserves. The company located such reserves very near the Castle Gate facilities at a site called Willow Creek, but the reserves there lacked a preparation plant.

The parent companies of Amax Coal and Cyprus Plateau merged in 1993 to form Cyprus Amax. The officers and directors of Amax Coal, Cyprus Plateau, and the newly formed Cyprus Amax were largely the same. Around the time of the merger, some of these officers began discussing a means by which Cyprus Plateau could acquire the Castle Gate Plant from Amax Coal for processing coal from Cyprus Plateau's new Willow Creek reserves. In May 1995, Amax Coal and Cyprus Plateau entered into a letter agreement concerning such a transfer, and in January 1996, the two companies closed on a contract transferring ownership of the Castle Gate Plant from Amax Coal to Cyprus Plateau.

Cyprus Plateau was not a NBCWA signatory, and the contract between the two companies did not include a successorship clause requiring Cyprus Plateau to assume Amax Coal's obligations under the NBCWA. In staffing the Castle Gate Plant, therefore, Cyprus Plateau relied on independent contract employees or non-UMWA workers from its Star Point mine. Cyprus Plateau did not recall former Amax Coal employees, all members of UMWA, to work at the Castle Gate Plant.

Believing the sale of the Castle Gate Plant from Amax Coal to Cyprus Plateau without the latter's assumption of the former's obligations under the NBCWA amounted to a breach of contract, the UMWA sued Amax Coal in federal court. It also sued Cyprus Amax and Cyprus Plateau for tortious interference with the contract. After four days of trial, the jury agreed with the UMWA and found for the union on its breach of contract and tortious interference claims. Amax Coal moved for judgment as a matter of law under FED. R. CIV. P. 50 and for a new trial under FED. R. CIV. P. 59, which the district court denied. Amax Coal appeals this ruling and also contends the district court's instructions to the jury improperly construed the law of this circuit and require reversal. Cyprus Amax and Cyprus Plateau contend that § 301 of the Labor Management Relations Act of 1947 (LMRA), 29 U.S.C. § 185(a), preempts the UMWA's tortious interference claim and, even if it does not, the district court improperly instructed the jury. We consider each contention in turn.

## II

### *Amax Coal Appeal*

### A.

The successorship clause in the 1993 NBCWA signed by Amax Coal and the UMWA, was designed to preserve the union's bargained-for rights upon the

sale of certain company properties to non-signatories. The clause reads as follows:

> This Agreement shall be binding upon all signatories hereto, including those Employers which are members of signatory associations, and their successors and assigns. In consideration of the Union's execution of this Agreement, each Employer promises that its operations covered by this Agreement shall not be sold, conveyed, or otherwise transferred or assigned to any successor without first securing the agreement of the successor to assume the Employer's obligations under the Agreement.

Aple. supp. app. at 211. The outcome of the UMWA's breach of contract claim, and thus Amax Coal's appeal, turns on the meaning of the term "operations" in the successorship clause because it is only the sale of "operations" that will trigger successorship obligations. Amax Coal contends that, as a matter of law, it did not transfer "operations" to Cyprus Plateau and that the district court erred in refusing to grant its Rule 50 motion on this issue or, at the minimum, grant its motion for new trial.

We review the district court's denial of a motion for judgment as a matter of law *de novo*, using the same standard applicable in district court. *Webb v. ABF Freight Sys., Inc.*, 155 F.3d 1230, 1238 (10th Cir. 1998). "Despite the breadth of our de novo standard of review, we may upset the jury's conclusion 'only if the evidence points but one way and is susceptible to no reasonable inferences supporting the nonmoving party.'" *Id.* (quoting *Yearous v. Niobrara County Mem. Hosp.*, 128 F.3d 1351, 1353 (10th Cir. 1997)). We may not weigh the evidence,

assess witness credibility, or substitute our conclusions for those of the jury. *Id.* "We review the denial of a motion for a new trial for an abuse of discretion, and we may reverse the district court 'only if [it] made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.'" *Id.* at 1246 (quoting *Weese v. Schukman*, 98 F.3d 542, 549 (10th Cir. 1996)).

Amax Coal centers its argument that it did not transfer "operations" to Cyprus Coal around three cases: this court's decision in *United Mine Workers of America v. U.S. Steel Mining, Inc.*, 895 F.2d 698 (10th Cir. 1990); the district court opinion we affirmed, *United Mine Workers of America v. U.S. Steel Mining, Inc.*, 636 F. Supp. 151 (D. Utah 1986); and an unpublished Ohio federal district court opinion upon which the district court in the latter case relied, *District 6, United Mine Workers of America v. North American Coal Corp.*, No. C-2-79-242 (S.D. Ohio Mar. 21, 1980). While Amax Coal is correct that *U.S. Steel Mining* constitutes the law of this circuit on the definition of "operations," that fact does not compel a holding in the company's favor in this case.

In *U.S. Steel Mining*, this court considered the sale of the Geneva/Horse Canyon Mine from U.S. Steel Mining Company to Kaiser Steel Corporation. U.S. Steel Mining owned and operated the mine from 1946 to 1984. *U.S. Steel Mining*, 895 F.3d at 700. In October 1982, U.S. Steel Mining placed the mine on "idle standby" and laid off the majority of the mine's employees. *Id.* In December of

the following year, the company "declared the mine abandoned and indefinitely closed." *Id.* Kaiser purchased the mine the next year, but Kaiser still had not "reopened the mine or engaged employees to produce coal at the mine" over five years later when this court issued its opinion. *Id.*

As here, the union in *U.S. Steel Mining* sued the former employer for breach of contract stemming from its alleged failure to comply with the successorship clause of the NBCWA. *Id.* This court held that clause inapplicable because U.S. Steel Mining had not sold "operations" to Kaiser. An "operation," we held, "refers to a mine site or facility where active coal mining operations are being conducted. That is, an 'operation' connotes a mine that is actively producing coal and operating as a coal mine." *Id.* A closed mine is not an operation "*assuming the mine was closed in good faith*." *Id.* (emphasis added). Because the district court found no evidence to raise an issue of bad faith in U.S. Steel Mining's closure of the mine long before its sale, we affirmed summary judgment for the company on the union's breach of contract claim. *Id.*

The district court in *U.S. Steel Mining* had fleshed out the issue of good faith. As explained by that court,

> [t]he mine closure *and subsequent sale must be carefully scrutinized to determine whether the mine was closed and later sold in good faith or as an attempt to circumvent or evade the collective bargaining agreement*. This utmost scrutiny is essential because a mine closure cannot be used by employers as a subterfuge to escape their obligations under the collective bargaining agreement. If there

-9-

is even the slightest hint that a mine has been closed to circumvent the collective bargaining agreement and undermine the successorship clause, a court should not accord weight to the fact that the mine has been closed prior to sale. In other words, . . . the court must examine the substance of a closure *and subsequent conveyance* to determine if the shutdown exalts form over substance.

*U.S. Steel Mining*, 636 F. Supp. at 154 (emphasis added). When we affirmed this decision, we noted we did so "[f]or substantially the same reasons stated by the district court . . . ." *U.S. Steel Mining*, 895 F.2d at 699.

In discussing the question of good faith, the district court in *U.S. Steel Mining* compared the facts before it to those in *North American Coal. See* 636 F. Supp. at 155-56. *North American Coal* concerned the sale of a mine tipple from North American Coal Corporation to Schiappa Coal Company. While the sale of the tipple did not occur until 1979, North American Coal had announced permanent closure of the mine a year earlier. *North American Coal*, No. C-2-79-242 at 2, 3. When the suit went to trial, Schiappa Coal had not commenced any operations at the mine. *Id.* at 6. While minor recovery work had occurred at the mine site, that work "was merely a winding down and packing up of the site" and not an active operation of the mine. *Id.* at 5-6. Because the court found no indication of bad faith on the part of North American Coal, it held the tipple was not an "operation" when sold and thus not subject to the NBCWA's successorship clause. *Id.* at 6.

According to Amax Coal, these cases establish as a matter of law that it did

not sell an "operation" to Cyprus Plateau in January 1996. We first note that the fact-bound nature of the inquiries into what constitutes an "operation" make such a holding unlikely. *See id.* at 6 ("The holding in this case is confined to the facts here . . . ."). More significantly, the facts in *U.S. Steel Mining* and *North American Coal* differ in material respects from those in the case before us.

There was no question in *U.S. Steel Mining* or *North American Coal* that the facilities at issue had permanently closed. Here, however, there was testimony that Amax Coal kept workers on hand to ensure the plant could reopen. Aple. supp. app. at 37. Neither the buyer in *U.S. Steel Mining* nor the buyer in *North American Coal* resumed operations within the relatively lengthy periods of litigation for both of those cases. Here, Cyprus Plateau is running a reopened plant with facilities substantially similar to those in use under Amax Coal's ownership. *Id*. at 11-12, 20-25, 69. Moreover, plans for reactivation of the Castle Gate Plant began long before the January 1996 transfer of ownership. *Id.* at 262-63; Aplt. app. at 74, 374, 384-85. The jury in this case was entitled to view the type of work done prior to the transfer as more than merely winding down, contrary to the facts in *U.S. Steel Mining* and *North American Coal.* In fact, the undertaking here looks more like reactivation. Aple. supp. app. at 232, 268-69; Aplt. app. at 74, 374, 384. In the two months prior to the transfer of the Castle Gate Plant from Amax Coal to Cyprus Plateau, contract employees at the

-11-

plant logged a total of 3,760 work hours. Aple. supp. app. at 276. The record thus reflects that the work done at the Castle Gate Plant differed quantitatively and qualitatively from the "limited recovery work" in *U.S. Steel Mining* and *North American Coal*.

This case is also distinguished by the nature of the transfer involved. There was no indication in either *U.S. Steel Mining* or *North American Coal* that the sales at issue were anything but arm's length transactions. The facts in this case tell a different story. First, here there was a sale of property between two wholly owned subsidiaries of the same parent company. Second, the directors for the parent company, Cyprus Amax, and both subsidiaries, Amax Coal and Cyprus Plateau, are the same, with the majority of corporate officers serving in the same roles for each company. Third, while Cyprus Plateau expressed no interest in the Castle Gate Plant before the merger of its parent with Amax Coal's, after the merger its interest was piqued. Finally, the President of Amax Coal, William Mark Hart, had a hand in the deal by which Cyprus Plateau acquired the Willow Creek property. Mr. Hart sent the letter of agreement concerning Cyprus Plateau's acquisition of the Castle Gate Plant on letterhead bearing the name of Cyprus Plateau's former parent company.

This commingling of corporate responsibility between Cyprus Amax, Amax Coal, and Cyprus Plateau, raised for the jury's consideration the specter of bad

faith in the structuring of the reopening of the Castle Gate Plant. The union also elicited further testimony implicating bad faith. Officers at Cyprus Plateau were aware of Amax Coal's obligations under the NBCWA and were concerned about "the unclear situation with the union" at the Castle Gate property. *Id.* at 169. A Cyprus Plateau officer at the reopened Castle Gate Plant indicated to two former Amax Coal employees that he would like to rehire each of them but in light of the litigation surrounding the union contract, "hands were tied." *Id.* at 50-53, 70.

Amax Coal is simply wrong, therefore, when it argues its closure of the Castle Gate Mines in 1989 establishes as a matter of law that the sale of the Castle Gate Plant in 1996 was legitimate in light of the successorship clause to the NBCWA. The company appears to assert that once its operations closed, no subsequent reactivation could bring them back under the successorship clause's requirements. Such a narrow definition of "operations" is not supported by either the *U.S. Steel Mining* decisions or by *North American Coal*. Nor does it comport with the successorship clause's purpose of protecting the union's bargained-for rights. It is undisputed that by the terms of the NBCWA, Amax Coal would have been obligated to recall UMWA workers had it reopened the Castle Gate Plant itself. *Id.* at 212-13.

In sum, the union presented evidence from which the jury could infer that officers at Amax Coal, several of whom are also officers for Cyprus Plateau and

Cyprus Amax, intended to reopen the Castle Gate Plant, and in fact did so, but structured that reopening in such a way as to evade responsibilities under the NBCWA. Amax Coal was thus not entitled to judgment as a matter of law, and the district court did not abuse its discretion in denying its motion for a new trial.[2]

## B.

Amax Coal also attacks the district court's instruction on the breach of contract claim. The company argues the court erred when it instructed the jury that in order to determine the extent of Amax Coal's obligations under the NBCWA, the jury should include within its deliberations an examination of both the buyer's and seller's actions, as well as the past practices between the parties.[3]

[2]We reject Amax Coal's argument that this result renders any property ever governed by a collective bargaining agreement forever governed thereby. The good faith transfer of closed facilities later reopened by a good-faith purchaser is not implicated by our holding.

[3]The court instructed the jury as follows:

> In deciding whether the Castle Gate plant was an operation at the time of its sale, you should examine the status of the Castle Gate plant and consider what plans or activities have taken place at the plant. Factors you should consider include:
>
> (1) whether the Castle Gate plant was closed for good faith business reasons at the time of sale.
> (2) whether Amax Coal permanently closed or abandoned the Castle Gate plant in 1989 or thereafter and left it closed until the time of sale.

(continued...)

-14-

Specifically, Amax Coal contends the court's instruction did not comport with *U.S. Steel Mining*.

We review for abuse of discretion the district court's decision to give any particular instruction. *Webb*, 155 F.3d at 1248. Our overall concern is that the jury not be "seriously . . . misled in its understanding of the issues and law applicable to the case before it." *Id.* (quoting *United States v. Laughlin*, 26 F.3d 1523, 1528 (10th Cir. 1994)). If an instruction includes an incorrect statement of the law, as Amax Coal contends occurred in this case, we will find an abuse of discretion. *Id.*

Contrary to Amax Coal's representation, the courts in *U.S. Steel Mining* and *North American Coal* referenced the buyer's activities in the course of ruling on whether "operations" had been sold. *See U.S. Steel Mining*, 895 F.2d at 700; *U.S. Steel Mining*, 636 F. Supp. at 153; *North American Coal*, C-2-79-242 at 3;

---

[3](...continued)
   (3) whether the seller had plans to resume processing coal at the Castle Gate plant at or before the time of the sale.
   (4) whether the buyer had plans to resume – whether the buyer had plans to resume processing coal at the Castle Gate plant at or after the time of the sale.
   (5) whether the Castle Gate plant was [to] be reactivated at the time of the sale.
   (6) the condition of the Castle Gate plant at the time of sale.
   (7) the past practice of Amax Coal and the United Mine Workers.
Aplt. app. at 418-19.

*see also United Mine Workers of America v. LTV Steel Co. Inc.* (*In re* Chateaugay Corp.), 891 F.2d 1034, 1039 (2d Cir. 1989); *CF&I Fabricators of Utah, Inc. v. Conners* (*In re* CF&I Fabricators of Utah, Inc.), 163 B.R. 858, 871 (Bankr. D. Utah 1994). Aside from the aforementioned precedent supporting the district court's jury instruction, the unity of corporate entities exhibited by Amax Coal and Cyprus Plateau sharing a parent company, and questions of bad faith raised by the union's evidence, made consideration of Cyprus Plateau's activity particularly relevant in this case.

As to past practice, Amax Coal argues that any evidence of previous interactions between the parties became irrelevant when the union signed the 1993 NBCWA, which according to Amax Coal adopted *U.S. Steel Mining*'s definition of "operations." While we agree that the use of language regarding operations from *U.S. Steel Mining* in subsequent CBAs "strongly suggests the parties incorporated the [court's] interpretation of the agreements," *Carbon Fuel Co. v. United Mine Workers of America*, 444 U.S. 212, 222 (1979), it does not follow that the past practice between the parties became irrelevant to the issue before the jury. In maintaining that certain extrinsic evidence introduced was not pertinent to the definition of "operations" set forth in *U.S. Steel Mining*, Amax Coal ignores that opinion's parallel consideration of good faith. Interaction between the union and Amax Coal, as well as dealings between Amax Coal,

Cyprus Plateau, and Cyprus Amax, were all relevant to whether Amax Coal made a good faith sale or whether, instead, it structured a sale so as to avoid obligations under the NBCWA's successorship clause. The district court's instruction in this regard did not "seriously . . . [mislead the jury] in its understanding of the issues and law applicable to the case before it." *Webb*, 155 F.3d at 1248 (quoting *Laughlin*, 26 F.3d at 1528).

### C.

Finally, Amax Coal contends the district court erred by giving an instruction on good faith and fair dealing under contract law. It has long been the law in this circuit, however, that the covenant of good faith and fair dealing inheres in all contracts, including CBAs. *See Local 1912, Int'l Ass'n of Machinists v. United States Potash Co.*, 270 F.2d 496, 498 (10th Cir. 1959) ("Like every contract, [in a CBA] there is a 'covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'") (citing 3 WILLISTON, CONTRACTS § 670 (1936)). For a contrary position, the companies cite our unpublished opinion in *Foley v. Aspen Ski Lodge, Ltd.*, 208 F.3d 225, 2000 WL 223549 (10th Cir. Feb. 28, 2000). That case does not constitute precedent, *see* 10TH CIR. RULE 36.3(A), and in any event it is inapposite. In *Foley*, a party urged this court to use the

-17-

covenant of good faith and fair dealing to imply into a contract a term which contradicted its express provisions. *Id.* at *2. The district court's instructions in this case created no such conflict with the terms of the NBCWA. Our longstanding precedent supports the district court's instructions.

## III

### *Cyprus Amax and Cyprus Plateau Appeals*

Cyprus Amax and Cyprus Plateau maintain they were entitled to judgment as a matter of law on UMWA's tortious interference with contract claim. It is their position that § 301 of the Labor Management Relations Act of 1947 (LMRA), 29 U.S.C. § 185(a),[4] preempts the union's claim. This is a legal determination that we review *de novo*. *Steinbach v. Dillon Cos.*, 253 F.3d 538, 539 (10th Cir. 2001).

Congress's power to preempt state law stems from the Supremacy Clause

---

[4] Section 301 provides:
Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

Labor Management Relations Act of 1947 (LMRA), ch. 120, sec. 301, 61 Stat. 136, 156 (codified at 29 U.S.C. § 185(a)).

found in Article VI of the United States Constitution. *See Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 208 (1985). The extent to which Congress meant the grant of federal jurisdiction in § 301 to preempt state law, however, is not altogether clear. *Id.* The Supreme Court has indicated that in applying § 301, the courts should "sustain a local regulation 'unless it conflicts with federal law or would frustrate the federal scheme.'" *Id.* at 209. That directive has come to mean that because federal law must govern the interpretation of CBAs, state law claims which present "the possibility of conflicting substantive interpretation" are wholly preempted and cannot be brought in any court. *See Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 103-04 (1962). Stated differently, "if the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law . . . is pre-empted . . . ." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405-06 (1988).

There is no doubt here that resolution of the UMWA's tortious interference claim "requires interpretation or application of the CBA[]." *Fry v. Airline Pilots Ass'n*, 88 F.3d 831, 836 (10th Cir. 1996). The district court instructed the jury that, under Colorado law, a claim of tortious interference with contract required findings that:

> (1) Plaintiff United Mine Workers and defendant Amax Coal had a contract in which defendant Amax Coal agreed that if it sold any operation covered by the union contract it would require any buyer to take over its contractual obligations to its employees.

-19-

(2) Defendant Cyprus Amax and/or Cyprus Plateau knew of Amax Coal's contract with United Mine Workers or had knowledge of other facts which reasonably should have caused them to know of that union contract.

(3) With such knowledge, defendant Cyprus Amax and/or Cyprus Plateau by words or conduct or both intentionally induced Amax Coal to breach its contract with . . . United Mine Workers, and []

(4) Defendant Cyprus Amax and/or Cyprus Plateau's words or conduct or both caused harm to plaintiff United Mine Workers, including employees represented by United Mine Workers.

Aple. supp. app. at 195-96. In order for Cyprus Amax and Cyprus Plateau to be liable for tortious interference with contract, therefore, the jury was required to find that Amax Coal breached the CBA.

In *Steinbach*, we held a claim for tortious interference with contract under Colorado law preempted by § 301 because a breach of the CBA was a necessary element of the state law tort. 253 F.3d at 540-41. The union sought to distinguish the present action from *Steinbach* by arguing that because the jury here was required to find for the UMWA on the breach of contract claim before reaching the tortious interference claim, it could merely import its breach of contract finding into its tortious interference analysis and resolve the second claim without further interpreting the CBA. This carefully constructed argument has some appeal, as evidenced by the district court's agreement with the union's position. We nonetheless remain unconvinced. The broad preemption doctrine erected by § 301 and strengthened by subsequent judicial interpretation cautions

-20-

against such a nuanced holding.

In *Lingle*, the Supreme Court made clear that state law claims dependent upon or determined by reference to a CBA are preempted by § 301. *Lingle*, 486 U.S. at 405-06 & n.4. While the Court did except from preemption those claims that merely "tangentially" involve a provision of a CBA, such as one in which a court looks to the CBA only for the calculation of damages, *id.* at 413 n.12, this is not such a case. The rights and duties undergirding the union's tortious interference claim exist only because they are contained in the NBCWA. Without reference to, and interpretation of the agreement, it would be impossible to determine the merits of the union's tortious interference claim. It is a stretch, therefore, for the union to argue that this claim is not preempted. Our own court and our companion circuits have consistently held that state-law tortious interference claims are preempted by § 301. *See Steinbach*, 253 F.3d at 540-41; *see also Kimbro v. Pepsico, Inc.*, 215 F.3d 723, 727 (7th Cir. 2000); *Beidleman v. Stroh Brewery Co.*, 182 F.3d 225, 235 (3d Cir. 1999); *Turner v. American Fed. of Teachers Local 1565*, 138 F.3d 878, 884 (11th Cir. 1998); *DeCoe v. Gen. Motors Corp.*, 32 F.3d 212, 218 (6th Cir. 1994); *Int'l Union, United Mine Workers of America v. Covenant Coal Corp.*, 977 F.2d 895, 899-900 (4th Cir. 1992); *Milne Employees Ass'n v. Sun Carriers, Inc.*, 960 F.2d 1401, 1411-12 (9th Cir. 1992); *Magerer v. John Sexton & Co.*, 912 F.2d 525, 530-31 (1st Cir. 1990); *Baylis v.*

*Marriott Corp.*, 906 F.2d 874, 877-78 (2d Cir. 1990); *Johnson v. Anheuser Busch, Inc.*, 876 F.2d 620, 624 (8th Cir. 1989).

In arguing against preemption, the union endorses an overly narrow view of the doctrine that is contrary to the weight of circuit and Supreme Court authority. The interests in interpretive uniformity and predictability, which § 301 preemption protects, do not allow state law claims such as the one brought here to go forward. The companies were entitled to judgment as a matter of law.[5]

## IV

In sum, we **AFFIRM** the judgment against Amax Coal, but we **REVERSE** the judgment against Cyprus Amax and Cyprus Plateau.

---

[5]Because we conclude Cyprus Amax and Cyprus Plateau were entitled to judgment as a matter of law on this claim, we need not reach their claim that the district court improperly instructed the jury under Colorado law.